Patricia BRAGG, et al., Plaintiffs,

v.

Colonel Dana ROBERTSON, et al., Defendants.

No. Civ.A. 2:98–0636.

United States District Court, S.D. West Virginia, Charleston Division.

Oct. 20, 1999.

Joseph M. Lovett, Mountain State Justice, Charleston, WV, James M. Hecker, Trial Lawyers for Public Justice, Washington, DC, for Patricia Bragg, James W. Weekley, Sibby R. Weekley, plaintiffs.

Patrick C. McGinley, Morgantown, WV, James M. Hecker, Trial Lawyers For Public Justice, Washington, DC, Suzanne M. Weise, Morgantown, WV, for The West Virginia Highlands Conservancy, Harry M. Hatfield, Carlos Gore, Linda Gore, Cheryl Price, Jerry Methena, plaintiffs.

Michael L. Keller, Assistant U.S. Attorney, Charleston, WV, Rebecca A. Betts, United States Attorney, Charleston, WV, Lois J. Schiffer, Asst. Atty. Gen., Steven E. Rusak, U.S. Department of Justice, Environment & Natural Resources Div., Environmental Defense Section, Washington, DC, Ruth Ann Storey, U.S. Department of Justice, Environment & Natural Resources Div., General Litigation Section, Washington, DC, Terry Clarke, U.S. Army Corps of Engineers, Office of Counsel, Huntington, WV, for Dana Robertson, Colonel, District Engineer, U.S. Army Corps of Engineers, Huntington District, defendant.

Michael L. Keller, Assistant U.S. Attorney, Charleston, WV, Rebecca A. Betts, United States Attorney, Charleston, WV, Lois J. Schiffer, Asst. Atty. Gen., Steven E. Rusak, U.S. Department of Justice, Environment & Natural Resources Div., Environmental Defense Section, Washington, DC, Ruth Ann Storey, U.S. Department of Justice, Environment & Natural Resources Div., General Litigation Section, Washington, DC, for Joe N. Ballard, Lieutenant General, Chief of Engineers and Commander of the U.S. Army Corps of

Engineers, Michael D. Gheen, Chief of the Regulatory Branch, Operations and Readiness Div., U.S. Army Corps of Engineers, Huntington District, defendants.

Thomas L. Clarke, William E. Adams, Jr., Craig B. Giffin, West Virginia Division of Environmental Protection, Office of Legal Services, Charleston, WV, Russell M. Hunter, West Virginia Division of Environmental Protection, Office of Mining & Reclamation, Nitro, WV, Benjamin L. Bailey, Brian A. Glasser, Bailey & Glasser LLP, Charleston, WV, for Michael Miano, Director, West Virginia Division of Environmental Protection, defendant.

Roger A. Wolfe, Robert G. McLusky, James R. Snyder, Jackson & Kelly, Charleston, WV, for Hobet Mining, Inc., Catenary Coal Co., Mingo–Logan Coal Co., intervenor-defendants.

W. Warren Upton, M. Shane Harvey, Jackson & Kelly, Charleston, WV, Terry R. Sammons, Jackson & Kelly, Charleston, WV, for The West Virginia Mining and Reclamation Association, West Virginia Coal Association, intervenor-defendants.

W. Henry Lawrence, IV, Robert D. Pollitt, Richard L. Lewis, Richard N. Farmer, Steptoe & Johnson, Charleston, WV, for Western Pocahontas Properties Limited Partnership, National Council of Coal Lessors, Inc., intervenor-defendants.

Grant Crandall, James M. Haviland, George P. Surmaitis, Crandall, Pyles, Haviland & Turner, Charleston, WV, for International Union, United Mine Workers of America, intervenor-defendant.

### MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending are cross-motions for summary judgment on *Counts* 2 and 3 of the Second Amended Complaint.[1] For reasons discussed more fully below, the Court **GRANTS** Plaintiffs' motion and **DENIES** Defendants' motion.

## I. PROCEDURAL AND FACTUAL BACKGROUND

These motions address a relatively small, but critical portion of an extended civil action concerning the form of surface coal mining commonly known as "mountaintop removal" mining.

Following extensive hearings on a proposed surface mining permit for the Hobet Spruce Fork mine, which the Court considered as an instance of the Plaintiffs' pattern and practice claims, the Court enjoined the federal Defendants[2] from issuing any further permits for that mine, stayed permits issued by the DEP Director, and enjoined the Arch subsidiaries from preconstruction or mining activities for the Spruce Fork operation until the case was resolved on the merits. *Bragg v. Robertson*, 54 F.Supp.2d 635 (S.D.W.Va. 1999). By Order of June 17, 1999 the Court accepted a settlement agreement which resolved *Counts* 11, 12, and 13 of the Amended Complaint concerning the Federal Defendants, although the Court retained jurisdiction to interpret and enforce the agreement until fully performed. *Bragg v. Robertson*, 54 F.Supp.2d 653 (S.D.W.Va.1999).

On July 26, 1999 a proposed consent decree, which purports to resolve all remaining issues with the exception of *Counts* 2 and 3, was presented to the Court. The consent decree was signed by Plaintiffs' counsel and Michael Miano, then

---

1. A joint motion for summary judgment was filed by Defendant Director of the West Virginia Department of Environmental Protection ("DEP"), and Defendant–Intervenors the Arch subsidiaries, the coal associations, the land companies, and the United Mine Workers of America.

2. The Federal Defendants were Dana Robertson, Colonel, District Engineer; Joe N. Ballard, Lieutenant General, Chief of Engineers and Commander; and Michael D. Gheen, Chief of the Regulatory Branch, Operations and Readiness Division, all of the United States Army Corps of Engineers.

Director of the DEP,[3] but the Director represented to the Court that West Virginia Code Section 5-3-2a requires public notice and comment before the agency may ask the Court to enter the decree. Additionally, the Court established its own period for public comment on the consent decree to end September 30, 1999. Accordingly, the motion to enter the consent decree remains pending.

All parties concede they cannot reach a settlement on the remaining counts, *Counts* 2 and 3, and that these counts are appropriate for summary judgment. The parties' opposing motions are now ripe for disposition.

### A. Mountaintop Removal Mining

The coalfields of southern West Virginia are mountainous, with steep wooded slopes. Coal in these mountains is found in seams of varying thickness sandwiched between layers of rock and dirt. In mountaintop removal mining,[4] the rock and dirt overburden or "spoil" is removed, layer by layer, and the coal is mined at the exposed surface, as it appears. The ultimate effect is to remove the mountaintop to a depth where deep mining is the practical method of recovery.

The Surface Mining Control and Reclamation Act of 1977 ("SMCRA"), Pub.L. 95-87 (1977) (codified at 30 U.S.C. §§ 1201-1328), provides general performance standards, which require coal mining operations "as [sic] a minimum" to "restore the approximate original contour of the land."[5] 30 U.S.C. § 1265(b)(3).

Where the volume of overburden is large relative to the amount of coal removed, and where that volume is increased due to the "swell factor" associated with earth removal, not all the earth and rock removed during mining is needed to restore AOC. The unneeded overburden is called "excess spoil."

Valley fills are composed of excess spoil, that is coal mine waste material,[6] which is disposed of by placing it in a valley. The topography of the coalfields and gravity dictate that valleys contain streams, so that valley fills also are generally placed in streams and streambeds.

### B. Counts 2 and 3: The Buffer Zone Rule

*Counts* 2 and 3 are superficially simple. Both involve the so-called "buffer zone rule," a SMCRA rule which provides:

No land within one hundred feet (100′) of an intermittent or perennial stream shall be disturbed by surface mining operations including roads unless specifically authorized by the Director. The Director will authorize such operations only upon finding that surface mining activities will 1) not adversely affect the normal flow or 2) gradient of the stream, 3) adversely affect fish migration or 4) related environmental values, 5) materially damage the water quantity or 6) quality of the stream and 7) will not cause or contribute to violations of applicable State or Federal water quality standards.

---

**3.** Miano has since been succeeded by Michael Castle as DEP Director. Hereafter the Defendant Director of the DEP will be identified as "the Director" or "DEP Director."

**4.** "Mountaintop removal mining means surface mining activities, where the mining operation removes an entire coal seam or seams running through the upper fraction of a mountain, ridge or hill ... by removing substantially all of the overburden off the bench and creating a level plateau or gently rolling contour, with no highwalls remaining[.]" 30 C.F.R. § 785.14 (1998).

**5.** Waivers to approximate original contour ("AOC") requirements are available, generally when land will be put to "an equal or better economic or public use." 30 U.S.C. § 1265(e)(3)(A); *see also* 30 C.F.R. § 824.11.

**6.** "Valley fills are constructed from and used to dispose of the spoil or coal mine waste material generated during mining operations." *West Virginia Coal Assoc. v. Reilly*, 728 F.Supp. 1276, 1280 (S.D.W.Va.1989) (Copenhaver, J.), *aff'd.* 932 F.2d 964, 1991 WL 75217 (4th Cir.1991) (unpublished).

W.Va.Code St.R. ("C.S.R.") title 38 § 2–5.2 (numerals added); *see also* 30 C.F.R. § 816.57.

*Count* 2 of the Second Amended Complaint alleges the Director engaged in a pattern and practice of approving buffer zone variances based on permit applications that did not include findings required before such variances may be approved. *Count* 3 alleges the Director's authority under this rule does not (or cannot) extend to permitting activities, in particular, valley fills, that bury substantial portions of intermittent and perennial streams.

The facts essential to resolution of these summary judgment motions are undisputed. The Director and his agents consistently admit that he made none of the required findings, one through six, for buffer zone variances when authorizing valley fills.[7] At the preliminary injunction hearing, permit reviewers testified, for example:

> If the company has shown that the fill is necessary during the review of the application with the spoil balance and stuff and they show that the fill will be stable, then ... in the area of the fill, we do not require them to make those [buffer zone variance] findings.

(Tr. of Prelim.Inj. Hr'g ("PI") at 133 (testimony of permit supervisor Larry Alt); *accord, id.* at 584 (Berthold K. Stollings testifying the buffer zone requirement is not applied to the segment of a stream filled by a valley fill).)

Surface mine permit applications support the agency testimony that the required findings were not made. A typical application relates:

The normal flow and gradient of the stream will be adversely affected in the areas of the proposed durable rock [valley] fills and the required sediment control for each. Surface mining activities as proposed in this application make disturbance in these areas necessary.

. . .

Fish migration and related environmental values will be adversely affected in the areas of the proposed durable rock [valley] fills and the required sediment control for each. Surface mining activities as proposed in this application make disturbance in these areas necessary.

(Surface Mine Permit Application S–5021–97; Pls.' Mem. in Supp.Pls.' Mot.Summ.J. ("Pls.' Mem"), Ex. 2). Based on applicant assertions that contend the buffer zone requirements could not be met, buffer zone variances, without required findings, were granted for numerous valley fills.

Further, Defendants have never denied that the stream segments buried under a valley fill no longer exist. Because the streams no longer exist, Defendants agree the required findings about stream flow, environmental values and water quantity and quality cannot be made. (*See, e.g.,* Alt testimony, PI at 159.) Instead, Defendants offer legal arguments and interpretations of the buffer zone rule, which, they propose, allow them to authorize valley fills in intermittent and perennial streams.

Defendants initially argue that the buffer zone rule does not apply to the segment of the stream filled, the "footprint" of the valley fill, but only to stream portions below the valley fill.[8] Next, Defendants propose that when the buffer zone rule is read

---

7. The Director claims finding number seven is made when a 7 Section 401 approval is given prior to a Section 404 permit issuing. See water quality discussion *infra,* at II.D.2.b.

8. This argument may be mooted by Defendants' ultimate change of position in the recent briefings and in the August Memorandum of Understanding, that "the buffer zone rule does apply to the footprint of fills." (Defs.' Reply at 11.)

Throughout the course of this litigation until August 1999, Defendants maintained the footprint of the valley fill was exempt from the stream buffer zone requirements. For example, in the Answer to the Second Amended Complaint, filed July 6, 1999, the Director "specifically denies that the buffer zone rule bans valley fills, or applies to the footprint of an approved fill." (Answer to Second Am. Compl. ¶ 73.)

in conjunction, and harmonized, with other SMCRA regulations, valley fills are not precluded by the buffer zone rule.

Finally, Defendants advance that in August 1999 the DEP, United States Environmental Protection Agency ("EPA"), Office of Surface Mining ("OSM"), and the United States Army Corps of Engineers ("Corps") entered into a Memorandum of Understanding ("MOU").[9] The August 99 MOU allows 1) that valley fills may be constructed in intermittent and perennial streams and 2) that the findings for the buffer zone authorization are to be met through compliance with the ostensibly comparable Clean Water Act ("CWA") requirements necessary to carry out dredge and fill activities under CWA § 404. According to Defendants, therefore, *Count* 2 is now moot because the Director will be making the new findings. Defendants argue they are entitled to summary judgment on *Count* 3 because CWA § 404 permits fill operations and, thus, the Director is not precluded from authorizing valley fills in intermittent and perennial streams under the MOU interpretation.

## II. DISCUSSION

### A. Jurisdiction

#### 1. 11th Amendment and Sovereign Immunity

As a West Virginia state official, the DEP Director raises a sovereign immunity defense under the Eleventh Amendment to the United States Constitution.

The Eleventh Amendment limits federal court jurisdiction:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any foreign state.

Since 1890, the amendment has been interpreted also to prohibit suits against a state by its own citizens. *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

Following a series of recent Supreme Court cases, the Eleventh Amendment currently is construed to prohibit private actions against states in federal or state [10] court except 1) where the state consents, 2) to the extent authorized under Section five of the Fourteenth Amendment,[11] or 3) where the action is asserted against a state officer for prospective declaratory and injunctive relief under *Ex parte Young. See* Erwin Chemerinsky, *Federal Jurisdiction* § 7.4 (1994). This action is a citizen suit against the West Virginia DEP Director, a state officer, for prospective declaratory and injunctive relief.

The Court previously determined it had jurisdiction over the Director under the *Ex*

As noted above, Defendants now propose, in their reply brief filed August 30, 1999 and in the August MOU, that the buffer zone rule does apply to the footprint of valley fills.

Because both positions are presented and argued in Defendants' briefing on the summary judgment motions at hand, the Court addresses each argument in turn, without regard to whether Defendants now claim to have embraced or renounced the position, and without undue concern for the internal consistency of Defendants' arguments.

9. The MOU is entitled "For the Purpose of Clarifying the Application of Regulations Related to Stream Buffer Zones Under the Surface Mining Control and Reclamation Act for Surface Coal Mining Operations that Result in Valley Fills."

10. *Alden v. Maine,* 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) (holding Congress's Article I powers do not extend to abrogation of nonconsenting state's sovereign immunity to private suits on federal claims in state courts).

11. *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (holding Congress lacks power under Article I (Commerce Clause) to abrogate states' sovereign immunity from suits commenced or prosecuted in the federal courts; however, 14th Amendment, section five powers do allow such abrogation).

*parte Young* doctrine. *See Bragg v. Robertson,* 183 F.R.D. 494, 496–97 (S.D.W.Va. 1998). Ever mindful of the need to assure its jurisdiction, and considering the Supreme Court's extensive attention to the Eleventh Amendment in the past year, the Court, *sua sponte,* invited the parties to brief sovereign immunity in light of current case law.

Having reviewed the parties' submissions, the Court is satisfied no issues have been raised that suggest the Court does not continue to enjoy jurisdiction under *Ex parte Young.*[12] The *Ex parte Young* doctrine is an exception to the Eleventh Amendment bar to private suits against States, a bar which is separate and distinct from the abrogation doctrine on which Defendants rely. Accordingly, the Court finds and concludes it has jurisdiction under *Ex parte Young* of this civil action against the DEP Director, a state official, to consider awarding prospective injunctive and declaratory relief from an pattern and practice of federal law violations under SMCRA.

## B. SMCRA and Buffer Zone Regulations

SMCRA's first enumerated purpose is "establish[ing] a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations." 30 U.S.C. § 1202(a). SMCRA contemplates "a continuing part-

nership between the states and the federal government, with the Secretary [of the Interior] providing oversight, advice, and backup authority, and the states bearing the major responsibility for implementation of the Act." *In re Permanent Surface Mining Regulation Litigation,* 653 F.2d 514, 516 (D.C.Cir.1981).

Under an approved state program, such as that in West Virginia, the state regulatory authority decides whether mining companies' permit applications meet the State[13] and federal SMCRA requirements. The state agency is the issuer of surface mining permits. *See* 30 U.S.C. § 1260. In West Virginia, the state regulatory agency is the DEP. Mining operations must also obtain permits under the CWA (Pub.L.92–500) (1972) (codified at 33 U.S.C. §§ 1251 *et seq.*). Under current regulatory practice, required CWA permits include a Section 401 permit certifying any proposed discharge will comply with applicable water quality standards, 33 U.S.C. § 1341; a Section 402 permit allowing discharge of pollutants from a point source into waters of the United States, 33 U.S.C. § 1342; and a Section 404 permit allowing discharge of dredge and fill material into waters of the United States, 33 U.S.C. § 1344.

OSM promulgated the buffer zone rule in 1979 to implement SMCRA Sections 515(b)(10) and (24) (codified at 30 U.S.C.

**12.** Defendants declare, but do not argue, that the presence of a state court forum is dispositive against *Ex parte Young* jurisdiction for federal courts. (Defs.' Joint Mem. in Supp. Summ.J. ("Defs.' Mem.") at 18.) When Justices Rehnquist and Kennedy proposed this principle, it was soundly rejected by the remainder of the Court. *See Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997). Justice O'Connor, joined by Scalia and Thomas in concurrence, notes, "[T]he principal opinion cites not a single case in which the Court expressly relied on the absence of an available state forum as a rationale for applying *Young.*" *Id.* at 291, 117 S.Ct. 2028. O'Connor continues with a ringing defense of *Ex parte Young:* "We have frequently acknowledged the importance of having federal courts

open to enforce and interpret federal rights.... [T]he availability of prospective relief of the sort awarded in *Ex parte Young* gives life to the Supremacy Clause.... [T]he *Young* doctrine has been accepted as necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to the supreme authority of the United States." *Id.* at 293, 117 S.Ct. 2028 (citations and quotation marks omitted). The Court, therefore, believes the *Ex parte Young* exception provides jurisdiction over this civil action.

**13.** The state surfacing mining law is the West Virginia Surface Coal Mining and Reclamation Act ("SCMRA"), W.VaCode §§ 22–3–1, *et seq.* (1998 & Supp.1990).

§ 1265(b)(18) and (24)).[14] SMCRA provides:

General performance standards shall be applicable to all surface coal mining and reclamation operations and shall require the operation as *a minimum to —*

. . .

(18) refrain from the construction of roads or other access ways up a stream bed or drainage channel or in such proximity to such channels so as to seriously alter the normal flow of water;

. . .

(24) *to the extent possible using the best technology currently available, minimize disturbances and adverse impacts of the operation on fish, wildlife, and related environmental values, and achieve enhancement of such resources where practicable.*

30 U.S.C. §§ 1265(b)(18) & (24) (emphasis added).

To carry out this statutory program, the *federal* buffer zone rule provides:

(a) No land within 100 feet of a perennial stream or an intermittent stream shall be disturbed by surface mining activities, unless the regulatory authority specifically authorizes surface mining activities closer to, or through such a stream.

The regulatory authority may authorize such activities only upon finding that—

(1) Surface mining activities will not cause or contribute to the violation of applicable State or Federal water quality standards, and will not adversely affect the water quantity and quality or other environmental resources of the stream.[15]

30 C.F.R. § 816.57.

The *state* buffer zone regulation is similar, but requires additional specific findings to be made by the Director before buffer zone incursions may be authorized:

No land within one hundred feet (100') of an intermittent or perennial stream shall be disturbed by surface mining operations including roads unless specifically authorized by the Director. The Director will authorize such operations only upon finding that surface mining activities will not adversely affect the normal flow or gradient of the stream, adversely affect fish migration or related environmental values, materially damage the water quantity or quality of the stream and will not cause or contribute to violations of applicable State or Federal water quality standards.[16] The

---

**14.** "Authority for this Section is Sections 102, 201, 501, 504, 506, 507, 508, 510, 414, and 517 of the Act. In particular, this Section is promulgated to implement Sections 515(b)(10 and 515(b)(24) of the Act." 44 Fed.Reg. 15176 (March 13, 1979) (promulgating buffer zone rule).

**15.** Under federal SMCRA regulations:
*Intermittent stream* means—(a) a stream or reach of a stream that drains a watershed of at least one square mile, or (b) A stream or reach of a stream that is below the local water table for at least some part of the year, and obtains its flow from both surface runoff and ground water discharge.
*Perennial stream* means a stream or part of a stream that flows continuously during all of the calendar year as a result of ground-water discharge or surface runoff. 30 C.F.R. § 701.5.
State regulations are almost identical, except identify a "part" of a perennial stream as a "portion" thereof. 38 C.S.R. § 2–2.88. For our purposes, the terms are synonymous.

**16.** In requiring specific findings, the state rule follows an earlier version of the federal rule. When the rule was amended to its present form, the agency reported:
The "final paragraph . . . does not include the specific references to the 'normal flow or gradient of the stream,' to 'fish migration,' and to 'material damage'. . . . The removal of these terms does not affect the [environmental impact statement] analysis as it applies to these final rules because they are all subsumed in the final proscription against causing or contributing to the violation of applicable State or Federal water quality standards and against adversely

Under the state CWA regulations, "*intermittent streams* have no flow during sustained periods of no precipitation and [ ] do not support aquatic life whose life history requires residence in flowing waters for a continuous period of at least six (6) months." 46 C.S.R. § 1–2.10. "Perennial streams" are not there defined.

area not to be disturbed shall be designated a buffer zone and marked accordingly.

38 C.S.R. § 2–5.2.

When OSM promulgated the buffer zone rule to implement SMCRA in 1979, it emphasized *protection* of streams, stream channels, and stream ecology: "Buffer zones are required to protect streams from . . . gross disturbance of stream channels." 44 Fed.Reg. 15176. The buffer zone rule "recognizes that small streams may have a biologic community of considerable complexity worthy of protection under section 515(b)(24) of the Act, even if the streams are not perennial." *Id.* The rule "protects stream channels, but contemplates that the regulatory authority may allow surface mining activities to be conducted within 100 feet of a perennial stream [or intermittent stream] if operations . . . can be conducted in an environmentally acceptable manner." *Id.* "Because of the significance of streams as features on the mine landscape, the [OSM] believes .that rules on how streams are to be treated and protected should be spelled out. [The buffer zone rule] establishes the kinds of streams that have the level of biological significance that triggers direct protective measures." *Id.* at 15177. In 1983 when it modified the rule slightly, OSM reiterated these concerns: "Because of the significance of streams, OSM will specify how streams are to be treated and protected." 48 Fed.Reg. 30312 (June 30, 1983).

**1. The Buffer Zone Rule Applies to All Portions of a Stream**

Defendants do not disagree that streams should be protected, but explain this language refers to the entire stream system. Plaintiffs, Defendants allege, are "myopic" to think that OSM is speaking of particular stream segments. (Defs.' Mem. at 5.) Defendants read the OSM's stream protec-

tions to apply to a stream's entirety, so that one part of a stream, usually the headwaters and upper reaches, may be filled, i.e., covered by a valley fill, as long as stream quantity and quality are not adversely affected downstream. This interpretation, however, leads to the *reductio ad absurdum* that miles of streams could be filled and deeply covered with rock and dirt, but. if some stretch of water downstream of the fill remains undiminished and unsullied, the stream has been protected. The regulations provide otherwise. Under State regulations, an intermittent stream is "a stream or reach of a stream," that is, a portion of· a stream. Perennial streams are "a stream or portion" thereof. State regulations clearly contemplate protecting stream portions.

■ Federal regulations also refer to a perennial stream *or part of a .stream* and an intermittent stream *or reach* thereof. *See* 30 C.F.R. § 701.5. Where such streams or their parts exist, they are to be protected by application of the buffer zone rule. *See* 30 C.F.R. § 816.57. As the United States Department of the Interior reported in the Final Environmental Statement implementing section 501(b) of SMCRA,[17] "The program should *directly protect* the quantity and quality of the *waters within and downstream of areas mined* and habitat characteristics, *including streambeds* and velocities, *on which aquatic species are dependent.*" (*Permanent Regulatory Program Implementing Section 501(b) of [SMCRA],* OSM–EIS–1, Jan. 1979, AIII–7, Pls.' Mem., Ex. 6 (emphasis added).) Nothing in the statute, the federal or state buffer zone regulations, or the agency language promulgating the federal regulations suggests that portions of existing streams may be destroyed so long as (some other portion of) the stream is saved. The Court finds and concludes the buffer zone rule protects

---

affecting the water quantity and quality or other environmental resources of the stream."
48 Fed.Reg. 30312 (June 30, 1983).

**17.** Title V–Control of the Environmental Impacts of Surface Coal Mining, Pub.L. 95–87, § 501 (1977) (Environmental Protection Standards).

entire intermittent and perennial streams, not just portions thereof.

Defendants make two responses to this analysis. First, they argue that interpreting the buffer zone rule to prohibit valley fills in streams is inconsistent with other portions of SMCRA, which Defendants believe presuppose valley fills will be placed in streams. Second, Defendants propose § 404 of the CWA specifically permits "fills" in the waters of the United States and therefore authorizes valley fills for disposing of excess spoil, as provided in the August 9, 1999 MOU.

## 2. Harmonizing the Buffer Zone Rule with SMCRA

Defendants argue that even if buffer zone protection refers to entire streams, courts must read statutory provisions so that, when possible, no part of a statute is superfluous. *See, e.g., United States v. Childress,* 104 F.3d 47 (4th Cir.1996). Defendants point to other surface mining regulations which they believe implicitly acknowledge that valley fills may be placed in streams. Therefore, they argue, to "harmonize" the regulations, the buffer zone rule must be interpreted to allow valley fills.

First, Defendants identify a state regulation concerning "natural drainways," which provides:

Natural drainways in the permit area shall be kept free of overburden except where overburden placement has been approved. Overburden placement and haulageways constructed across natural drainways shall not materially increase the sediment load, or materially affect stream quality.

38 C.S.R. § 2–5.2. "Natural drainway" is a defined term, meaning "any natural water course which may carry water to the tributaries and rivers of the watershed." 38 C.S.R. § 2–77. The state regulation allows overburden placement in natural drainways, where approved. Intermittent and perennial streams are natural drainways, Defendants argue,[18] and thus overburden may be placed in intermittent or perennial streams.

This logical progression, however, ignores the definitional language: "natural drainways ... *may* carry water *to the tributaries* and rivers of the watershed." A "tributary" is "one that is tributary to another as [ ] a stream feeding a larger stream or a lake." [19] The "tributaries and rivers of the watershed" are, therefore, by definition, its streams and rivers. Natural drainways may carry water *to* the tributaries and rivers of the watershed. Because they carry water *to* the tributaries, natural drainways are not the tributary streams themselves. Rather, the natural drainways are above the tributaries and may carry water *to* them.

■ The structure of the regulations supports this analysis, providing different rules for natural drainways, § 5.1, than for intermittent and perennial streams, § 5.2. Overburden placement may be approved in natural drainways, if it does not materially increase the sediment load or materially affect stream quality, but no overburden shall be placed in intermittent or perennial streams unless the Director makes the required buffer zone findings. *See* 38 C.S.R. §§ 2–5.1, 5.2. The Court, thus, finds and concludes that overburden place-

18. In depositions, a number of hydrogeologists were asked whether streams were natural drainways. Naturally, they said "yes." (*See, e.g.,* Charles H. Norris, Plaintiffs' hydrogeologist, explaining that intermittent and perennial streams occupy natural drainways, Defs.' Mem., Ex. 5 at 87–88.) However, "natural drainway" is not a technical term within hydrogeology, which these experts might explicate. The experts are simply speaking English. In common parlance, streams *are* natural drainways. In everyday speech, creeks, branches, rivulets, runs, brooks, and even rivers are all natural drainways. However, "natural drainway" is a defined term with legal implications within the regulations and its explicit definition must be respected.

19. Webster's Third New International Dictionary (1981).

ment in natural drainways is not inconsistent with the buffer zone rule.[20]

■ Second, Defendants identify a federal regulation which, they argue, depends on the assumption that fills will be built in areas with intermittent or perennial water flow:

> A rock-core chimney drain may be used in a head-of-hollow fill,[21] instead of the underdrain and surface diversion system normally required, *as long as the fill is not located in an area containing intermittent or perennial streams.*

30 C.F.R. § 816.72(b) (emphasis added). Defendants propose "[t]his prohibition on rock-core drains *in 'intermittent or perennial streams,'* would be superfluous if the buffer zone rule already prohibited such fills." (Defs.Mem. at 11 (emphasis added).) More careful reading, however, reveals that the regulatory prohibition is on rock-core drains "located in *an area containing* intermittent or perennial streams." Such an area, of course, would include the buffer zone. In such an area, apparently, special care is required because, according to the regulation, a rock-core chimney drain is not sufficiently protective in areas where intermittent or perennial streams are located. The Court finds and concludes this regulation is not inconsistent with the buffer zone rule and in no way authorizes that valley fills may be located "in intermittent or perennial streams."

The Court further finds and concludes the SMCRA regulations may be harmonized without reading out or discounting the buffer zone rule. The rule states: No land within one hundred feet of an intermittent or perennial stream (including portions or parts thereof) shall be disturbed by sur-

face mining operations including roads unless specifically authorized by the Director. Valley fill waste disposal is a surface mining operation from which streams are protected. No other SMCRA regulations implicitly or explicitly contemplate such stream fill. Accordingly, the buffer zone rule, which protects entire intermittent and perennial streams from incursions within the one hundred foot buffer zone, is harmonious with other state and federal SMCRA regulations and must be accorded full force and effect.

### C. The August 1999 Memorandum of Understanding and CWA § 404

In August, 1999 during the briefing period set for these summary judgment motions, a MOU was entered into by OSM EPA, the Corps, and DEP, which purports to provide a "clarification" of stream buffer zone regulations under SMCRA. After a brief introduction, the MOU begins:

> Section 404 of the Clean Water Act (CWA) authorizes the U.S. Army Corps of Engineers (Corps) to permit the discharge of dredged or fill material into waters of the U.S., including wetlands. *Discharges of excess spoil fill in waters of the U.S. from surface coal mining operations* resulting in only minimal adverse environmental impacts *are eligible for authorization under a CWA Section 404* General Permit; discharges causing more than minimal adverse environmental impacts are subject to CWA Section 404 Individual Permit Review.

(Defs.' Resp., Ex. 1 at 2 (emphasis added).) No authority is provided for the general proposition underlined above. On that basis, the MOU goes on to state that water quality findings required under CWA Sec-

---

**20.** "Ephemeral stream means a stream which flows only in direct response to precipitation in the immediate watershed or in response to the melting of a cover of snow and ice, and which has a channel bottom that is always above the local water table." 30 C.F.R. § 701.5.

Ephemeral streams may carry water to intermittent and perennial streams and so may

satisfy the definition of "natural drainways". The Court is not prepared to impose this interpretation, but simply notes that ephemeral streams appear to satisfy the syntax and logic of the definition.

**21.** Fills that are constructed at the beginning or upper reaches of a valley are called "head-of-hollow" fills. *See* 30 C.F.R. § 701.5.

tion 404, the 404(b)(1) Guidelines,[22] are "comparable" to the findings required for buffer zone variances under SMCRA. The MOU seeks "to enhance effective coordination and timeliness in the evaluation of proposals to discharge excess spoil fills in waters of the United States." (*Id.* at 3.) To that end,

> OSM and WVDEP believe that, where a proposed fill is consistent with the requirements of the Section 404(b)(1) Guidelines and applicable requirements for Section 401 certification of compliance with water quality standards, the fill would also satisfy the criteria for granting a stream buffer zone variance under SMCRA and WVDEP regulations.

(*Id.*) That is, the agencies signatory to the MOU propose to interpret the buffer zone regulation by substituting CWA 404(b)(1) Guidelines applicable to dredge and fill operations (and CWA Section 401 water quality certification, a Section 404 prerequisite) for buffer zone findings in buffer zone variance requests.

The buffer zone rule is a SMCRA rule. Under SMCRA, a savings clause provides that nothing therein "shall be construed as superseding, amending, modifying, or repealing the. . . . Clean Water Act, the State laws enacted pursuant thereto, or other Federal laws relating to preservation of water quality." 30 U.S.C. § 1292(a)(3). If CWA § 404 permits valley fills, Defendants argue, a SMCRA rule cannot prohibit them. Otherwise, the buffer zone rule would create an impermissible conflict between SMCRA and the CWA, a conflict in which CWA regulations, pursuant to the SMCRA savings clause, must prevail.

Defendants propose the MOU substitution of 404(b)(1) Guidelines for buffer zone findings moots *Count* 2 because the Director will no longer be required to make the buffer zone findings and under *Count*

3, applying 404(b)(1) standards, the Director may authorize valley fills.

## 1. Administrative Rulemaking

Plaintiffs argue the MOU initiates a profound change in the state surface mining regulatory program, essentially overriding buffer zone protections, but failing to follow SMCRA's mandatory procedures for program amendment: publication in the Federal Register, notice, public comment, evaluation by application of established criteria, and publication of the OSM Director's final decision in the Federal Register. *See* 30 C.F.R. §§ 732.17(g), (h)(1), (h)(2), (h)(11) & (h)(12). In opposition, Defendants urge the Court to treat the MOU as an interpretive rule.

■ An agency rule is considered "interpretive" rather than "substantive" when 1) it is not promulgated pursuant to the legislative power delegated to the agency by Congress to make rules having the force of law, or 2) the agency intends it to be "no more than an expression of its [own] construction of a statute or rule." *Reilly,* 728 F.Supp. at 1292 (quoting *Chamber of Commerce of the United States v. OSHA,* 636 F.2d 464, 468 (D.C.Cir.1980)). While an agency's own characterization is indicative of whether it intended the rule to be "interpretive" or "substantive," it is not dispositive. *Id.* Rather, the substance of the agency's action is decisive. *Id.* Interpretive rules merely "remind[ ] affected parties of existing duties." *Id.* (citations omitted).

The MOU itself disavows any substantive effect:

> The policy and procedures contained in this MOU are intended solely as guidance and do not create any rights, either substantive or procedural, enforceable by any party. *This document does not, and is not intended to, impose any legally binding requirements on Federal*

---

**22.** The 404(b)(1) Guidelines are codified at 33 U.S.C. § 1344(b)(1). *See also* 40 C.F.R. pt.

230 (1998).

*agencies, States, or the regulated public,* and does not restrict the authority of the employees of the signatory agencies to exercise their discretion in each case to make regulatory decisions based on their judgment about the specific facts and application of relevant statutes and regulations.

(MOU at 4 (emphasis added).) Defendants further argue that the MOU does not work a substantive change in the law because, first, CWA § 404(b)(1) Guidelines provide the same or greater protection than the buffer zone regulation. Second, because nothing in SMCRA may be construed as superseding, amending, modifying, or repealing the CWA, 30 U.S.C. § 1292(a)(3), if valley fills are permitted under the CWA, then the SMCRA buffer zone rule cannot preclude them. Defendants thus characterize the MOU as a non-substantive agency interpretation, entitled to the Court's deference.

While appreciating the Plaintiffs' concerns about the provenance and context of this interpretation proffered by Defendants,[23] the Court believes it cannot refuse to consider the MOU. It is put forward by the appropriate agencies [24] as an interpretive rule which purports to settle all litigation on these two counts and require judgment in favor of Defendants. In the agencies' view, the rule merely reminds affected parties of existing duties because it codifies current practice. According to Defendants, the longstanding practice under CWA § 404 is to permit fills when

required 404(b)(1) Guideline findings are made. The MOU proposal simply applies this CWA authority to valley fills. Accordingly, the Court analyzes the MOU as an interpretive rule.

 It is well established that when faced with a problem of statutory construction, "great deference [must be shown] to the interpretation given the statute by the officers or agency charged with its administration." *Drummond Coal Co. v. Hodel,* 610 F.Supp. 1489, 1495–96 (D.D.C.1985) (quoting *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965)). Deference is even more important when the interpretation of an administrative regulation is involved. *Id.* at 1496. When interpreting regulations, "the ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Id.* (quoting *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 413–14, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945)). " 'Absent a contrary indication in the statute,' the [appropriate agency's] judgment must be accepted." *In re Permanent Surface Mining Regulation,* 653 F.2d at 522.

### 2. CWA § 404 Dredge and Fill Permits

#### a. Corps' § 404 permit authority

Section 404 of the CWA governs the issuance of permits for discharges of dredged or fill material into waters of the United States.[25] The Corps was given au-

**23.** *See supra* note 8.

**24.** The Secretary of the Interior is authorized to administer the requirements of SMCRA. *See* 30 C.F.R. § 700.3. The Director of OSM Reclamation and Enforcement, under the general direction of the Assistant Secretary, Energy and Minerals, is responsible for exercising the authority of the Secretary. *Id.* § 700.4(a).

The 404(b)(1) guidelines have been developed by the Administrator of the EPA in conjunction with the Secretary of the Army acting through the Chief of Engineers. *See* 40 C.F.R. § 230.2(a).

The DEP Director issues the state surface mining permits.

Therefore, OSM, EPA, the Corps, and DEP, who have signed the MOU, are the appropriate agencies to interpret the 404(b)(1) guidelines and the buffer zone rule.

**25.** Codified at 33 U.S.C. § 1344. Under the CWA, the phrase "waters of the United States" has been consistently interpreted broadly to include not only navigable waters and interstate waters, but all waters tributary to them. *See* 33 C.F.R. § 328.3(a) (1998). It is undisputed that intermittent and perennial streams are waters of the United States.

thority over § 404 dredge and fill permits in recognition of the Corps' historical role under Section 10 of the Rivers and Harbors Act of 1899 as the permitting agency for dredge and fill activities in the nation's navigable waters. *See* 33 U.S.C. § 403; 42 Fed.Reg. 37,122 (1977).

Section 404 permits, issued by the Corps, authorize dredge and fill operations in waters of the United States. "Dredged material" is "material that is excavated or dredged from waters of the United States." 33 C.F.R. § 323.2(c). It is undisputed the overburden originating from mountaintop mining is not excavated or dredged from the waters of the United States. The Corps defines "fill material," for which Section 404 permits also may be issued, as:

> any material used for the primary purpose of replacing an aquatic area with dry land or of changing the bottom elevation of an [sic] waterbody. *The term does not include any pollutant discharged into the water primarily to dispose of waste, as that activity is regulated under section 402 of the Clean Water Act.*[26]

33 C.F.R. § 323.2(e) (emphasis added). This "primary purpose" definition explicitly excludes "pollutants"[27] discharged into the water primarily to dispose of waste.

Under Section 404, the Corps regulates the "discharge of fill material," which:

> includes, without limitation, the following activities: Placement of fill that is necessary for the construction of any structure in a water of the United

States; the building of any structure or impoundment requiring rock, sand, dirt, or other material for its construction; site-development fills for recreational, industrial, commercial, residential, and other uses;[28] causeways or road fills; dams and dikes; artificial islands, property protection and/or reclamation devices such as riprap, groins, seawalls, breakwaters, and revetments; beach nourishment; levees; fill for structures such as sewage treatment facilities, intake and outfall pipes associated with power plants and subaqueous utility lines; and artificial reefs.

33 C.F.R. § 323.2(f). These uses are all constructive and do not include any sort of waste disposal.

While valley fills in intermittent or perennial streams have the incidental effect of replacing an aquatic area with dry land and changing the bottom elevation of streams, their primary purpose is the disposal of rock and dirt, that is, industrial waste, the overburden or excess spoil which must be removed to mine the coal in mountaintop removal mining. *See Friends of Santa Fe County v. LAC Minerals, Inc.*, 892 F.Supp. 1333, 1342 (D.N.M.1995) (determining gold mine overburden not fill material subject to section 404); *Reilly*, 728 F.Supp. at 1286–87 (finding Corps' definition of "fill material" does not include disposal of waste or spoil in valley fills).

As Judge Copenhaver previously analyzed and stated the law of this district:

---

**26.** Discharges governed by Section 402 of the CWA, 33 U.S.C. § 1342, are under the regulatory auspices of the EPA, not the Corps.

**27.** "Pollutants" are defined as "dredged spoil, solid waste, incinerator residue, filter backwash, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, ... heat, wrecked or discarded equipment, *rock, sand,* cellar dirt and *industrial,* municipal, and agricultural *wastes* discharged into water." 40 C.F.R. § 122.2 (emphasis added).

**28.** The Court notes this portion of the definition might support Section 404 permits for valley fills with the primary purpose of land development in conjunction with properly permitted waivers of AOC. Defendants argue fills are necessary for dams, roads, and other development projects. The Court agrees. Site development fills for recreational, industrial, commercial, residential, and other uses are appropriately permitted under Section 404. In comparison, however, as discussed *infra,* valley fills constructed for the primary purpose of excess spoil disposal are not so authorized.

[B]ecause the [Corps'] definition of fill material includes only material placed for the "primary purpose" of "changing the bottom elevation of a waterbody," it would appear that the [Corps] never intended to regulate the disposal of waste or spoil in valley fills. The primary purpose of the fills ... is to dispose of waste ..., not to create dry land such as is needed for construction of buildings or land development, as contemplated by the [Corps'] definition above.

*Reilly*, 728 F.Supp. at 1286–87.

Our Court of Appeals, affirming *Reilly* in an unpublished opinion, similarly stated, "The discharge of fill material at issue here is expressly for the purpose of disposing of waste or spoil from the mining operations." *West Virginia Coal Assoc. v. Reilly*, 932 F.2d 964, 1991 WL 75217 at *4 (4th Cir.1991).

 The Court finds and concludes that overburden or excess spoil, being a pollutant and waste material, is not "fill material" subject to Corps' authority under Section 404 of the CWA when it is discharged into waters of the United

States for the primary purpose of waste disposal. The Corps' § 404 authority to permit fills in the waters of the United States does not include authority to permit valley fills for coal mining waste disposal. Fills with the primary purpose of waste disposal are regulated by the EPA under CWA § 402.[29] Accordingly, the August MOU is inconsistent with the CWA to the extent it bases its proposal on the Corps' authority to authorize waste fills in the waters of the United States.

### b. EPA specifications for § 404 disposal sites: 404(b)(1) Guidelines

The Corps has primary responsibility for regulating the discharge of dredged and fill material into navigable waters under CWA Section 404. Congress additionally gave the EPA authority under Section 404 to promulgate guidelines for specification of disposal sites for dredged and fill material. *See* 33 U.S.C. § 1344(b)(1). These EPA Guidelines are the so-called "404(b)(1) Guidelines," 40 C.F.R. pt. 230, which the August MOU proposes to substitute for buffer zone findings.

29. Under the Settlement Agreement, while Plaintiffs retained their right to challenge any future action by the Corps authorizing valley fills in waters of the United States under CWA Section 404, they surrendered their right to challenge such authorization with the argument that mining spoil is waste, and not fill material, under 33 C.F.R. § 323.2(e).

Additionally, under the Settlement Agreement, *Counts* 1 and 12 were dismissed with prejudice. *Count* 1 alleged the DEP Director failed to require Section 402 permits for valley fills, allowing them to be authorized under Section 404. *Count* 12 alleged the Corps was engaged in a pattern and practice of granting nationwide permits for valley fills under Section 404 of the CWA, rather than requiring permits under Section 402.

This Settlement Agreement among the parties, however, in no way prevents, nor could prevent, the Court from analyzing the MOU, as a proposed interpretive rule, in light of the controlling statutes, regulations and case law. Because Defendants propose employing CWA 404(b)(1) Guidelines in place of SMCRA buffer zone findings, the Court must inquire whether the MOU is consistent with SMCRA

and with the CWA, or whether it is a clearly erroneous interpretation of those statutes.

For the same reasons, Defendants' argument that this Court has no jurisdiction to enforce CWA standards in a SMCRA-based citizen suit fails. The Court here analyzes the August MOU, Defendants' proposed interpretive rule, to determine its consistency with CWA § 404 and associated Guidelines and regulations. Defendants cannot propose to alter SMCRA by introducing portions of the CWA, and then claim that because Plaintiffs did not have the foresight to bring suit under the law Defendants propose to substitute, the Court has no jurisdiction to interpret the substituted statute.

The Court is not enforcing the CWA against violation. The Court is interpreting the MOU for consistency with both the CWA and SMCRA, given Defendants' proposal to substitute CWA 404(b)(1) Guidelines for SMCRA buffer zone findings. The Court's action is necessary and required in this SMCRA-based citizen suit.

**658**

Within the site specification Guidelines, EPA defines "[f]ill material" as "any 'pollutant' which replaces portions of the 'waters of the United States' with dry land or which changes the bottom elevation of a water body for any purpose." 40 C.F.R. § 232.2. Because this EPA 404(b)(1) definition of "fill material" explicitly includes pollutants replacing dry land or changing the bottom elevation of a water body "for any purpose," Defendants propose these Guidelines are the appropriate Guidelines for CWA regulation of valley fills.

■ The Guidelines, however, only provide site specifications for the Corps to exercise its primary Section 404 authority. The EPA site specifications can neither enlarge nor exceed the Corps' Section 404 authority. The Corps' Section 404 authority does not extend to fills composed of pollutants "discharged into the water primarily to dispose of waste." 33 C.F.R. § 323.2(e). Accordingly, the Court finds and concludes neither the Corps nor the EPA can authorize 404(b)(1) fills "for any purpose," where the primary purpose is waste disposal. Accordingly, the basis of the August MOU is inconsistent with the CWA.

The August MOU provides,

Discharges of excess spoil fill into waters of the U.S. from surface coal mining operations . . . are eligible for authorization under . . . CWA Section 404 . . . permit review. The Corps has the responsibility to review applications and to make decisions whether to authorize permits for Section 404 regulated discharges, including discharges of excess spoil material.

(MOU at 2.) Excess spoil valley fills are a waste disposal practice. The Court finds and concludes the August MOU, as an interpretive rule, is inconsistent with the CWA. The MOU is a clearly erroneous interpretation of the CWA to the extent it proposes employing CWA Section 404 or

its disposal site specification guidelines to authorize fills with the primary purpose of waste disposal. The Corps, in consultation with EPA, has regulatory authority under the CWA only where excess spoil is placed for constructive purposes as provided at 33 C.F.R. § 323.2(e).

Finally, the Court finds and concludes that because the CWA does not authorize valley fills for the primary purpose of waste disposal, there is no impermissible conflict between the CWA and the SMCRA buffer zone rule. The buffer zone rule thus is not overridden nor outranked by CWA Section 404. It remains in full force and effect.

**3. Substitution of 404(b)(1) Guidelines for Buffer Zone Findings**

Although the Corps lacks authority to authorize valley fills with the primary purpose of waste disposal under Section 404, the August MOU is not strictly dependent on that purported authority. As the MOU relates, the DEP (with OSM "assistance and/or oversight") issues surface mining permits, which certify the mining project is eligible for a buffer zone variance. Although the Court holds § 404 permits may not issue for fills with the primary purpose of waste disposal, that holding, without more, does not preclude the proposed substitution. The appropriate agencies [30] propose to interpret the SMCRA buffer zone rule using the Guidelines, which they characterize as "comparable," or the "functional equivalent" of the buffer zone findings. Thus, the Court must assess, also, whether the 404(b)(1) Guidelines are comparable to the current buffer zone rule, so as to be consistent with SMCRA and the CWA.

The purpose of the 404(b)(1) Guidelines is "to restore and maintain the chemical, physical, and biological integrity of waters of the United States through the control of discharges of dredged or fill material." 40 C.F.R. § 230.1. These Guidelines begin with what is elsewhere described [31] as a "presumption against discharge":

**30.** *See supra,* note 24.

**31.** *See* 40 C.F.R. § 230.6(c).

Fundamental to these Guidelines is the precept that dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern.[32]

40 C.F.R. § 230.1(c).

Subpart B of the 404(b)(1) Guidelines provides further relevant restrictions on discharge of fill and dredged material:

(b) No discharge of dredged or fill material shall be permitted if it:

(1) Causes or contributes, after consideration of disposal site dilution and dispersion, to violations of any applicable State water quality standard.

. . .

(c) Except as provided under section 404(b)(2),[33] no discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States.

40 C.F.R. § 230.10(b)(1). This 404(b)(1) standard of *significant degradation* of the waters of the United States is the standard the MOU proposes to substitute for buffer zone findings.

Findings of significant degradation under 404(b)(1) Guidelines require factual findings of:

(1) *Significantly adverse effects of the discharge* of pollutants on human health or welfare, including but not limited to effects on municipal water supplies, plankton, fish, shellfish, wildlife, and special aquatic sites.

(2) *Significantly adverse effects of the discharge* of pollutants on life stages of

aquatic life and other wildlife dependent on aquatic ecosystems, including the transfer, concentration, and spread of pollutants or their byproducts outside of the disposal site . . .

(3) *Significantly adverse effects of the discharge* of pollutants on aquatic ecosystem diversity, productivity, and stability. Such effects may include, but are not limited to, loss of fish and wildlife habitat or loss of the capacity of a wetland to assimilate nutrients, purify water, or reduce wave energy; or

(4) *Significantly adverse effects of discharge* of pollutants on recreational, aesthetic, and economic values.

40 C.F.R. § 230.10(c) (emphasis added).

The 404(b)(1) Guidelines' standard for disapproval of sites for Section 404 fill discharge is "significant degradation" of the waters of the United States. The standard for approval of buffer zone variances is "will not adversely affect," *inter alia,* related environmental values. In explaining why the Fish and Wildlife Service ("FWS") declined to sign the August MOU, David Densmore, FWS field office chief, succinctly compared the two standards:

The two regulations differ in both the degree of degradation allowed (*significant* under section 404 and *will not adversely affect* under SMCRA regulations) and in the types of degradation considered. While Section 404 limits its analysis to aquatic impacts, SMCRA allows an evaluation of *other environmental resources of the stream,* in addition to water quantity and quality issues. According to the *Federal Register* announcement adopting SMCRA's regulations at 30 CFR 816.57, "the phrase 'and related environmental resources' has been added to the language of the final

---

**32.** The terms " 'aquatic environment' and 'aquatic ecosystem' mean waters of the United States, including wetlands, that serve as habitat for interrelated and interacting communities and populations of plants and animals." 40 C.F.R. § 230.3.

**33.** Where 404(b)(1) guidelines would prohibit the specification of a site, the additional consideration of the "economic impact of the site on navigation and anchorage" is required. 33 U.S.C. § 1344(b)(2).

rule to indicate that regulatory authorities will be allowed to consider factors other than water quantity and quality in making buffer zone determinations."

(Pls.' Reply, Ex. 1.) Densmore concludes, "The 404 standard is, in effect, lower than the SMCRA standard, regardless of how the regulations have been applied on the ground." (*Id.*) Densmore's comparison is accurate. The 404(b)(1) standard, which allows degradation (adverse effect) of aquatic resources until the degradation becomes significant is a lower and less restrictive standard than the buffer zone standard, which allows *no adverse effect* on environmental resources.

Each of these two distinct standards with different levels of environmental protection is appropriate to the context in which it occurs. The CWA 404(b)(1) standard for constructive dredge and fill operations trades off some degradation of the aquatic ecosystem for economic, industrial, and recreational development. Where approved, development is allowed unless it significantly degrades water resources. In comparison, the SMCRA buffer zone rule protects entire streams through their intermittent reaches from surface mining activities, which are not allowed within one hundred feet of intermittent or perennial streams if environmental values will be *adversely affected.* The buffer zone rule is implemented to "minimize disturbances and adverse impacts of the [surface mining] operation on fish, wildlife, and related environmental values, and achieve enhancement of such resources where practicable." 30 U.S.C. § 1265(b)(18). The

buffer zone standard, "not adversely affect," conforms to the statute.

 Accordingly, the Court finds and concludes that the proposed substitution of 404(b)(1) Guideline standards for buffer zone findings is inconsistent with the buffer zone rule because it substitutes a more lenient, less protective standard than the SMCRA regulation now requires. To use 404(b)(1) Guidelines to permit valley fills in intermittent and perennial streams for the primary purpose of waste disposal is also inconsistent with CWA Section 404 under which Section 404(b)(1) is authorized.[34] The Court therefore holds the August MOU must be rejected as inconsistent with, and an erroneous interpretation of, the statutes under which it is proposed. Accordingly, the Court holds the MOU is without force or effect on the extant buffer zone requirement. In sum, the buffer zone requirement means what it says, and it was not supplanted by the August 1999 MOU.

### D. Summary Judgment on Counts 2 and 3

Summary judgment is appropriate where there is no genuine issue as to a material fact and movant is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The parties agree that no issues of material fact exist which would prevent the Court from reaching judgment as a matter of law on *Counts* 2 and 3.

#### 1. Count 2

*Count* 2 alleges the DEP Director is engaged in a pattern and practice of ap-

---

**34.** The Court notes that a series of cases cited by Defendants for the proposition that waste fills may be permitted under 404(b)(1) do not, in fact, stand for that proposition. (*See* Defs.' Resp. at 13–14 (citing *New Hanover Township v. United States Army Corps of Engineers,* 796 F.Supp. 180 (E.D.Pa.1992), *vacated on other grounds,* 992 F.2d 470 (3rd Cir.1993); *Orange Environment, Inc. v. County of Orange,* 811 F.Supp. 926 (S.D.N.Y.1993); *Resource Inv., Inc. v. United States Army Corps of Eng'rs,* 151 F.3d 1162 (9th Cir.1998)).) These cases all involve municipal solid waste landfills in wet-

lands and, as the Ninth Circuit Court of Appeals held in *Resource Investments,*

> The Corps lacks authority under section 404 of the CWA to require a landowner to obtain a dredge and fill permit from the Corps before constructing a municipal solid waste landfill on a wetlands site. The construction of a municipal solid waste landfill on a wetlands site is regulated by the EPA and states with solid waste permit programs approved by the EPA under [the Resource Conservation and Recovery Act].

151 F.3d at 1169.

proving buffer zone variances on the basis of applications that do not include the required findings, when approving valley fills in intermittent and perennial streams.

State surface mining permits may not issue until DEP certifies "the permit application is accurate and complete and that all the requirements of this Act and the State or Federal program have been complied with." 30 U.S.C. § 1260(b); *see also* 38 C.S.R. § 2–3.32.d; 30 C.F.R. § 773.15. This is a non-discretionary duty.

The buffer zone regulation requires:

The Director will authorize such operations only upon finding that surface mining activities will 1) not adversely affect the normal flow or 2) gradient of the stream, 3) adversely affect fish migration or 4) related environmental values, 5) materially damage the water quantity or 6) quality of the stream and 7) will not cause or contribute to violations of applicable State or Federal water quality standards.

38 C.S.R. § 2–5.2 (numerals added).

The Director and his agents consistently admit that he made none of the required findings, one through six.[35] The Director says either the agency's legal interpretation of the buffer zone rule [36] made application of buffer zone findings unnecessary for valley fills, or the Director applied CWA Section 404 requirements instead of buffer zone findings. The Director acknowledges all previous applications for buffer zone variances in mountain top removal operations have been reviewed in this manner.

■ Through this Memorandum Opinion and Order, the Court has determined the Director's legal rationales for failure to make the required buffer zone findings were inconsistent with the controlling statutes and regulations and relied on clearly erroneous interpretations of those laws. Accordingly, the Court **GRANTS** summary judgment for Plaintiffs on *Count* 2 of the Second Amended Complaint and holds the Director has a nondiscretionary duty to make the findings required under the buffer zone rule before authorizing any incursions, including valley fills, within one hundred feet of an intermittent or perennial stream.

### 2. *Count 3*

*Count* 3 alleges the DEP Director engaged in a pattern and practice of approving applications for surface mining permits that disturb buffer zones by allowing valley fills, an activity which cannot satisfy the criteria for a variance. Therefore, the Director violated his nondiscretionary duty to withhold approval of permit applications that were not complete and accurate and in compliance with all requirements of the state and federal programs.

### a. Findings one through six

■ Plaintiffs' arguments that required buffer zone findings one through six cannot be made for valley fill waste disposal buffer zone incursions are simple and non-technical. The Director may approve such disturbance only upon finding surface mining activities will 1) not adversely affect the normal flow or 2) gradient of the stream, 3) adversely affect fish migration or 4) related environmental values, or 5) materially damage the water quantity or 6) quality of the stream. When valley fills are permitted in intermittent and perennial streams, they destroy those stream segments. The normal flow and gradient of the stream is now buried under millions of cubic yards of excess spoil waste material, an extremely adverse effect. If there are fish, they cannot migrate. If there is any life form that cannot

---

**35.** The Director claims finding number seven is made, implicitly, when a Section 401 approval is given prior to a Section 404 permit issuing. See water quality discussion *infra,* II.D.2.b.

**36.** *See supra* note 8.

acclimate to life deep in a rubble pile, it is eliminated. No effect on related environmental values is more adverse than obliteration. Under a valley fill, the water quantity of the stream becomes zero. Because there is no stream, there is no water quality. The Director lawfully cannot make required findings one through six for buffer zone variances for valley fills. In the stream portion filled, these requirements cannot provide a principled rationale for allowing valley fills.

### b. Finding seven: State and federal water quality standards

Finding number seven requires the Director to find the valley fill will not cause or contribute to violations of applicable State or federal water quality standards.[37] Under federal regulations, States must specify water quality standards, which include appropriate water uses to be achieved and protected. *See* 40 C.F.R. § 130.6(c)(4)(i). "In no case shall a State adopt waste transport or waste assimilation as a designated use for any waters of the United States." 40 C.F.R. § 131.10(a); *see also* 46 C.S.R. § 1–6.1(a). Defendants argue this regulation is irrelevant to valley fills because they "are not designed to be 'assimilated' or 'transported' by a stream; they are designed to stay in one place." (Defs.' Resp. at 11 n. 8.) This argument ignores the reality that valley fills are waste disposal projects so enormous that,

rather than the stream assimilating the waste, the waste assimilates the stream. The Court holds that placement of valley fills in intermittent and perennial streams violates federal and state water quality standards by eliminating the buried stream segments for the primary purpose of waste assimilation.

Federal and state water quality standards also have an antidegradation component, which provides, "existing water uses and the level water quality necessary to protect the existing uses shall be maintained and protected." 40 C.F.R. 131.12(a)(1); 46 C.S.R. § 1–4.1(a). "[A]t a minimum all waters of the State are designated for the Propagation and maintenance of Fish and Other Aquatic Life ... and for Water Contact Recreation consistent with [CWA] goals."[38] 46 C.S.R. § 1–6.1. State and federal antidegradation policy require "the existing high quality waters of the State must be maintained at their existing high quality."[39] If limited degradation is allowed,[40] "it shall not result in injury or interference with existing stream water uses or in violation of State or federal water quality criteria." 46 C.S.R. § 1–4.1.b.

Certain characteristics of industrial waste, indicative of degradation, are objectionable in all waters of the State under West Virginia water quality standards. Not allowed, for example, are "materials in

---

37. The Director argues the required findings have been made because a CWA § 404 permit cannot be issued until a § 401 permit is in place, assuring any applicable water quality standards have been met. Because § 404 permits may not authorize waste disposal operations such as valley fills, however, reliance on prerequisite findings for § 404 permit approval for water quality standards for valley fill waste disposal operations is misplaced.

38. This standard is frequently referred to in shorthand fashion as "fishable/swimmable," but that is not entirely accurate. "An existing aquatic community composed entirely of invertebrates and plants, such as may be found in a pristine alpine tributary stream, should still be protected whether or not such a stream supports a fishery.... The term

'aquatic life' would more accurately reflect the protection that was intended in section 101(a)(2) of the [CWA]." EPA, *Water Quality Standards Handbook* § 4.4.

39. The testimony is uncontraverted that Pigeonroost Branch, proposed to be buried under a valley fill at the Hobet Spruce Fork mine, is a high quality state water. (*See, e.g.,* Politan Dep. at 188.)

40. *See* 40 C.F.R. § 131.12(a)(2). The federal formulation provides clarity in stating that limited degradation is allowed only "[w]here the quality of the waters *exceed* levels necessary to support propagation of fish, shellfish, and wildlife and recreation in and on the water[.]" *Id.* (emphasis added).

concentrations which are harmful, hazardous or toxic to man, animal or aquatic life." 46 C.S.R. § 1–3.2.e. In stream segments filled with excess spoil,

> new mining techniques result in tremendous volumes of overburden waste material and a consequent increase in the size of valley filling, extending into intermittent and perennial stream reaches. Today the volume of a single stream fill can be as much as 250,000,000 cubic yards, with stream burials up to 2 miles long.

(Pls.' Mem., Ex. 5.) [41] This concentration of industrial waste is mortal to animal or aquatic life in the stream segment buried. Existing stream uses are not protected, but destroyed. These effects are inconsistent with State and federal water quality standards.

Federal and State water quality standards require the waters of the United States shall not be used for waste assimilation nor be degraded. The Director cannot make the required finding that valley fills will not cause or contribute to violations of applicable State or federal water quality standards. In the stream portion filled, those standards are inevitably violated. Accordingly, the Court **GRANTS** summary judgment for Plaintiffs on *Count* 3 and holds the Director has a nondiscretionary duty under the buffer zone rule to deny variances for valley fills in intermittent and perennial streams because they necessarily adversely affect stream flow, stream gradient, fish migration, related environmental values, water quality and quantity, and violate state and federal water quality standards.

The Court **GRANTS** Plaintiffs' motion for a permanent injunction enjoining the Director from further violations of the nondiscretionary duties discussed above and from approving any further surface mining permits under current law that would authorize placement of excess spoil in intermittent and perennial streams for the primary purpose of waste disposal.

## III. OBSERVATION

Defendants have argued throughout the briefing on these summary judgment motions that application of the buffer zone rule, "if implemented by the Court ... would end not only mountaintop mining but virtually all types of mining by eliminating valley fills." (*See, e.g.,* Defs.' Mem. at 1.) Certainly, Defendants argue, legislators could not have intended to "secretly" abolish coal mining by adopting the buffer zone regulation. (*Id.* at 14.)

When OSM promulgated the buffer zone rule in 1979, it considered comments on the buffer zone, intermittent and perennial stream definitions, and coal production:

> Surface mining is impossible without destruction of a number of minor natural drainages, including some ephemeral streams as defined in section 701.5. The Office, therefore, believes it is permissible to surface mine coal so long as a reasonable level of environmental protection is afforded.
>
> [ ] Several other commenters felt only perennial streams should require buffer zones. This would reduce operator cost and increase coal production from deposits underlying nonperennial streams. The Office believes that this alternative is illegal; however, because there are significant fish and wildlife resources in streams other than perennial streams that need protection under section 515(b)(24) of [SMCRA].

44 Fed.Reg. 15177 (1979). Thus, coal production and surface mining were considered when the regulations were promulgated. The regulator OSM nevertheless

---

**41.** United States Fish & Wildlife Service, *Permitted Stream Losses Due to Valley Filling in Kentucky, Pennsylvania, Virginia, and West Virginia: A Partial Inventory* (1998). The FWS makes a "highly conservative" estimate that stream impacts by valley filling authorized by the state of West Virginia exceed 469.3 miles. *Id.* at 8. Significant valley filling activities in three West Virginia mining districts were not included in the study. *Id.*

concluded that destruction of streams below natural drainways was illegal.

The Court is called upon to interpret the law and the regulations. To the extent misapprehension of the buffer zone rule was fostered by the Director or other agencies, the public and the remaining parties have been done a disservice. However, if application of the buffer zone rule, a regulation under federal law, prevents surface area coal mining or substantially limits its application to mountaintop removal in the Appalachian coalfields, it is up to Congress and the Legislature, but not this Court to alter that result.

## IV. CONCLUSION

To summarize, the Court **GRANTS** Plaintiffs' motion for summary judgment, **GRANTS** Plaintiffs' motion for a permanent injunction, and **DENIES** Defendants' motion for summary judgment.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to counsel of record.