KENTUCKIANS FOR THE
COMMONWEALTH,
INC., Plaintiff,

v.

Colonel John RIVENBURGH, Colonel, District Engineer; Robert B. Flowers, Lieutenant General, Chief of Engineers and Commander of the U.S. Army Corps of Engineers; and Michael D. Gheen, Chief of the Regulatory Branch, Operations and Readiness Division, U.S. Army Corps of Engineers, Huntington District, Defendants,

and

Kentucky Coal Association, Pocahontas Development Company, and AEI Resources, Inc., Intervenor–Defendants

No. CIV.A.2:01–0770.

United States District Court,
S.D. West Virginia.
Charleston Division.

May 8, 2002.

928

929

Joseph M. Lovett, Esq., John W. Barrett, Esq., Lewisburg, WV, Joe F. Childers, Esq., Lexington, KY, James M. Hecker, Esq., Trial Lawyers for Public Justice, Washington, DC, for Plaintiff.

Michael L. Keller, Esq., Kasey Warner, Esq., United States Attorney, United States Attorney's Office, Charleston, WV, Ruth Ann Storey, Esq., U.S. Department of Justice, Environment & Natural Resources Div., General Litigation Section, Washington, DC, Terry Clarke, Esq., U.S. Army Corps of Engineers, Office of Counsel, Huntington, WV, Steven E. Rusak, Esq., John C. Cruden, Esq., Jon M. Lipshultz, Esq., Thomas L. Sansonetti, Esq., U.S. Department of Justice, Environment & Natural Resources Division, Environmental Defense Section, Washington, DC, Russell W. Petit, Esq., U.S. Army Corps of Engineers, Office of Chief Counsel, Washington, DC, for Corps Defendants.

W. Henry Lawrence, IV, Esq., Robert D. Pollitt, Esq., Ancil G. Ramey, Esq., Richard L. Lewis, Esq., Steptoe & Johnson, Charleston, WV, for Defendant–Intervenor Pocahontas Development Company.

Richard J. Bolen, Esq., Huddleston, Bolen, Beatty, Porter & Copen, Huntington, WV, Timothy J. Hagerty, Esq., Amy D. Cubbage, Esq., Frost, Brown, Todd LLC, Louisville, KY, for Defendant–Intervenor AEI Resources, Inc.

Robert G. McLusky, Esq., James R. Snyder, Esq., Lindsey K. Griffith, Esq., Jackson & Kelly, Charleston, WV, for Defendant–Intervenor Kentucky Coal Association.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending are cross motions for summary judgment by Plaintiff Kentuckians for the Commonwealth, Inc. (KFTC), Defendant officers of the Army Corps of Engineers (Corps), and Intervenor–Defendants on *Count* One.

The Court holds that § 404 of the Clean Water Act does not allow filling the waters of the United States solely for waste disposal. Agency rulemaking or permit approval that holds otherwise is *ultra vires*, beyond agency authority conferred by the Clean Water Act. Only the United States Congress can rewrite the Act to allow fills with no purpose or use but the deposit of waste. Accordingly, Plaintiff's motion is **GRANTED** and Defendants' motions are **DENIED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Purportedly acting under the CWA, 33 U.S.C. § 1344 (§ 404), the Corps has permitted surface coal mining operations to dispose of overburden waste from moun-

taintop removal coal mining by filling hundreds of miles of streams in Appalachia. Appalachian coal occurs in narrow seams separated by dirt and rock called "overburden" or "spoil." In mountaintop removal mining, the overburden is blasted with explosive charges and pushed out of way to expose the coal seams. The overburden, which is nothing but waste, is disposed of by creating valley fills, that is, literally, filling the valleys with waste rock and dirt. Because mountain streams run into the valleys, creating massive valley fills has the inevitable effect of covering and obliterating many streams and the lifeforms within.

In June 2000 the Huntington (West Virginia) District office of the Corps[1] authorized Martin County Coal Corporation's (MCCC's) mountaintop removal coal mining project in Martin County, Kentucky. Authorized under a § 404 nationwide permit,[2] the project would create 27 valley fills, filling 6.3 miles of streams. The vast majority of the nation's valley fills are approved in the Huntington District by the Corps' officials who are Defendants here. Of the 306 NWP–21 permits issued nationwide in the year 2000, 257 were issued in the Corps' Huntington District. *Kentuckians for the Commonwealth v. Rivenburgh,* 204 F.R.D. 301, 305 n. 3 (S.D.W.Va.2001). All year–2000 NWP–21 permits in the nation impacted a total of 460,575 linear feet (approximately 87 miles) of stream. *Id.* Ninety-seven percent of stream length af-

fected, or 449,896 linear feet (approximately 85 miles), occurred in the Huntington district under NWP–21 permits authorized here. *Id.*

In *Count* One Plaintiff complains that the primary purpose of valley fills is to dispose of waste. Under the Corps' longstanding regulations, waste disposal is not an authorized purpose for a CWA § 404 permit. *See* 33 C.F.R. § 323.2(e). KFTC asks the Court to find and conclude the Corps has violated § 404 of the CWA, 33 U.S.C. § 1344, and the Administrative Procedures Act (APA), 5 U.S.C. § 706(2), because its actions are arbitrary, capricious, an abuse of discretion, and otherwise contrary to law.

The Corps acknowledges, as it must, that under current Corps' regulations waste disposal cannot be permitted under § 404. According to Defendants, this is a problem created by differences between the Corps' and the EPA's definitions of "fill material," which have "admittedly resulted in confusion." (U.S. Cross Mot. for Summ. J. at 1). For that reason, the agencies have undertaken rulemaking "reconciling" the definitions and "clarifying" that overburden waste may be disposed of in valley fills under CWA § 404.[3] (*Id.*) Additionally, Defendants argue the Court should defer to the Corps' longstanding practice of approving valley fills as "fill material" under § 404.

1. The Corps' Huntington District comprises roughly half the state of Ohio, more than half of West Virginia, portions of eastern Kentucky and western Virginia, and a relatively small area in North Carolina. *See Kentuckians for the Commonwealth v. Rivenburgh,* 204 F.R.D. 301, 305 (S.D.W.Va.2001)(explaining Corps' district boundaries are based on the watersheds of major rivers, rather than state lines).

2. Nationwide permits (NWPs) are available for activities that "will cause only minimal adverse environmental effects when per-

formed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1). NWP–21 permits issue for activities associated with surface coal mining.

3. On May 3, 2002, while the Court had these matters under consideration, EPA and the Corps signed for publication in the *Federal Register* their final rules on fill material and its discharge. The Court considers the proffered rule at II.D.2.

Both parties moved for summary judgment on these contrary interpretations of CWA § 404 and the Corps' authority to permit waste disposal under the guise of discharge of fill material.

An examination of the Clean Water Act (CWA), its legislative history, its predecessor statutes and regulations, its companion statutes, its longstanding administrative interpretation and judicial gloss has convinced the Court that § 404 was enacted for the purpose and with the effect of allowing disposal of only one type of pollutant or waste: dredged spoil. Permits for disposal of all other pollutants into national waters are to issue under CWA § 402. "Fill material," as regulated under § 404, refers to material deposited for some beneficial primary purpose: for construction work, infrastructure, improvement and development in waters of the United States, not waste material discharged solely to dispose of waste. Accordingly, approval of waste disposal as fill material under § 404 is *ultra vires*, that is, beyond the authority of either administrative agency, the Corps or Environmental Protection Agency (EPA). To approve disposal of waste other than dredged spoil, in particular mountaintop removal overburden, in waters of the United States under § 404 dredge and fill regulations rewrites the Clean Water Act. Such rewriting exceeds the authority of administrative agencies and requires an act of Congress.

## II. DISCUSSION

### A. *Summary Judgment Standard*

Summary judgment is appropriate where there is no genuine issue as to any material fact and judgment may be rendered as a matter of law. Fed.R.Civ.P. 56(c). The parties agree there are no issues of material fact, and the question for the Court is one of law: interpretation of § 404 of the CWA.

### B. *Agency Authority and the APA*

Agency power is "not the power to make law. Rather, it is 'the power to adopt regulations to carry into effect the will of Congress as expressed by the statute.'" *Brown & Williamson Tobacco Corp. v. Food & Drug Admin.*, 153 F.3d 155 (4th Cir.1998)(quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 213–14, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)(quoting *Manhattan Gen. Equip. Co. v. Comm'n*, 297 U.S. 129, 134, 56 S.Ct. 397, 80 L.Ed. 528 (1936))). It is fundamental, even "axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). The issue presented is whether Congress intended to delegate to the Corps the authority to permit waste disposal as discharge of fill material under its § 404 dredge and fill permit program, absent a primary constructive purpose.

If a statute is silent or ambiguous on a specific question, a reviewing court must defer to any reasonable construction of that statute by the administering agency. *Chevron, U.S.A. v. Nat'l Res. Defense Council*, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The agency's construction need not be the one the Court itself would adopt or the one the Court feels would best implement Congressional policy. It need only be a reasonable construction of the statutory question at issue. *Id.* at 844–45, 104 S.Ct. 2778.

If, however, the Court can ascertain Congress' intent on a particular question by applying the traditional rules of statutory construction, then it must give effect to that intent. *Brown & Williamson*, 153 F.3d at 162 (citing *Chevron* 467 U.S. at 843 n. 9, 104 S.Ct. 2778). Although the inquiry begins with the language of the

statute, it must be considered in context of the whole law, its object and policy. *See id.* Congressional intent may be ascertained further through the overall statutory scheme, legislative history, "the history of evolving congressional regulation in the area," and other relevant statutes. *Id.* (quoting *Dunn v. CFTC,* 519 U.S. 465, 117 S.Ct. 913, 137 L.Ed.2d 93 (1967))(other citations omitted).

■ Official actions are *ultra vires* when the official engages in conduct that the sovereign has not authorized. *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). Because administrative agencies have no power to act beyond authority conferred by Congress, the APA requires a court to "hold unlawful and set aside agency action ... found to be ... in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

## C. The Clean Water Act

The objective of the CWA is "to restore and maintain the chemical, physical, and biological integrity of the nation's waters." 33 U.S.C. § 1251(a). To that end, no pollutants may be discharged into the waters of the United States without a CWA permit. *See* 33 U.S.C. §§ 1311(a), 1362(7) &

(12). "Pollutant" includes, *inter alia,* "dredged spoil," "solid waste," "rock, sand, cellar dirt and industrial ... waste discharged into water." 33 U.S.C. § 1362(6). The parties agree overburden from mountaintop removal coal mining is a pollutant under the definition and requires a CWA permit.

Two major permit programs, §§ 402 and 404, authorize discharge of pollutants into waters of the United States.[4] *Id.* §§ 1342, 1344. Section 402 creates the National Pollutant Discharge Elimination System (NPDES), providing permits for discharge of pollutants. *Id.* § 1342. Section 404 authorizes permits for dredged or fill material. *Id.* § 1344. Neither "dredged material" nor "fill material" is defined in the statute.[5]

The Secretary of the Army (i.e., the Corps) issues § 404 permits for discharge of dredged or fill material at specified disposal sites. *Id.* § 1344(a). The EPA Administrator works with the Secretary to develop guidelines for disposal sites, *id.* § 1344(b), and may prohibit the use of a specified disposal site where a discharge "will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas." *Id.* § 1344(c).[6] Examination of

4. A third permit program provides for discharge of pollutants "under controlled conditions associated with an approved aquaculture project under Federal or State supervision." 33 U.S.C. § 1328(a). These three programs are the exclusive permitting programs. *See id.* § 1342(a).

5. Because discharge of all pollutants requires either a § 402 permit or a § 404 dredge and fill permit, Defendants argue "fill material" must be a "pollutant," a waste material, for which § 404 permits are available. As philosophers say, this argument begs the question. It assumes what it wishes to prove. Section 402 only says that "the discharge of any pollutant" must have a permit under § 402, "except as provided" in § 404. It does not say

everything provided for in § 404 is pollutant disposal.

6. Section 1344(c) oversight was invoked by the Deputy Administrator of EPA, W. Michael McCabe, with regard to the MCCC Martin County surface coal mine permit at issue here. After the Corps refused to suspend the NWP–21 permit while EPA investigated, McCabe elevated the issue to the civilian head of the Corps and asked him to overrule the district office.

McCabe stated it was "incredibl[e]" that the Corps believed the MCCC project would only cause minimal adverse environmental impacts and that it would qualify for an NWP–21. McCabe explained that EPA had invoked

the legislative history of the CWA, which established these central functions and relationships in § 404, demonstrates Congress did not intend § 404 permits to apply to fill discharges solely for waste or pollutant disposal, other than disposal of dredged spoil.

### 1. Legislative History of the CWA

The initial Senate version of the Federal Water Pollution Control Act (FWPCA)[7] regulated permits for discharge of all pollutants under § 402. Section 402(m) of the original bill treated the discharge of dredged spoil like any other pollutant. *See* S. Conf. Rep. No. 92–1236 (1972), reprinted in 1 Legislative History of the Water Pollution Control Act Amendments of 1972 (Legt.Hist.), 177.

The American Association of Port Authorities (AAPA) was "extremely concerned" with this proposal. *Bills Amending the Federal Water Pollution Control Act and Other Pending Legislation Relating to Water Pollution Control: Hearing Before the Senate Subcommittee on Air and Water Pollution of the Committee on Public Works,* 92nd Cong. (Appendix Mar. 15, 1971)(letter from Paul A. Amundsen, Executive Director AAPA).

[S]eaport facilities are dependent on Federal and private channel and pierside dredging, which, in turn, would be affected by the spoil disposal permitting procedure contained in the subject legislation.... The handling of spoil material from the dredging site to the contain-

ment or disposal area, like [its] planning, is an engineering function. Local conditions and the distance the material is to be transported must be weighed on the basis of economics. This is a thoroughly integrated decision having a strong bearing on the overall cost of the project. *We believe this function should remain with the U.S. Army Corps of Engineers as it has historically....* We respectfully point out that [additional restrictive legislation in the dredge spoil disposal area] would inhibit the orderly development of a national port system which handled 559 million tons of foreign trade in 1970[and] will be expected to handle the potentially vast increases in trade resulting from our nation's new trade policies with China and with the Soviet Union.

*Id.* (emphasis added). The port authority Association proposed to except "dredged or fill material" from § 402 and add a new section, to be numbered 404, which maintained permitting authority for dredged or fill material under the Secretary of Army (i.e., the Corps), as it currently existed. *Id.*

In floor debate, Senator Ellender, Democrat from Louisiana, offered an amendment that essentially followed the AAPA proposal, adding a new section, 404, under which the Secretary of the Army would issue permits for the discharge of dredged materials into the navigable waters at specified disposal sites. The Secretary

---

its 404(c) veto authority only 11 times since 1972 and once in the last ten years, and that it takes this action "in only the most serious circumstances out of an unequivocal concern for the protection of human health and the environment." Compl. ¶ 22.

In March 2001 the Corps denied EPA's request. It said it would review the project if MCCC began work. In August 2001 MCCC transferred its coal mining permit to Beechfork, which began work.

After KFTC moved for a preliminary injunction, the Corps modified Beechfork's NWP–21 permit to require compensatory mitigation for the 33, 120 feet of stream impacted by the project and prohibit fill discharge until the mitigation plan is approved by the Corps. KFTC then withdrew its motion. Beechfork has informed the Corps it intends to continue mining at the site.

**7.** Now commonly known as the "Clean Water Act."

would evaluate impact on navigation and anchorage and, in cooperation with the EPA Administrator, would determine those sites that would not adversely affect shellfish beds, fisheries (including spawning and breeding areas) or recreation areas. *See* 117 Cong. Rec. 38797 (Sen.debate, 92nd Cong., Nov. 2, 1971).

In support of the amendment Sen. Ellender explained it *"simply retains the authority of the Secretary of the Army to issue permits for the disposal of dredged materials* [, which] is essential since the Secretary of the Army is responsible for maintaining and improving the navigable waters of the United States." *Id.* (emphasis added). Ellender described a deficiency of the current bill: "that it treats dredged materials the same as industrial waste" and other refuse. *Id.* In contrast, Sen. Ellender argued, "The disposal of dredged material does not involve the introduction of new pollutants; it merely moves the material from one location to another." [8] *Id.* If the EPA effluent standards were applied to dredged spoil disposal, Ellender argued, "90 percent of the ports and harbors of the United States" would be closed, a "catastrophical situation." *Id.*

Sen. Muskie, chief sponsor of the legislation, responded that "mission-oriented agencies whose mission is something other than concern for the environment simply do not adequately protect environmental

values. That is not their mission." *Id.* He urged dredged spoil not be differentiated from other pollutants. A substitute amendment agreeable to both factions was proposed, which kept dredged spoil under § 402(m) with all other pollutants subject to EPA approval, but also required dredged spoil disposal areas in navigable water to be certified by the Secretary of the Army as the only reasonable alternative and by the EPA Administrator not to adversely affect municipal water supplies, shellfish beds, wildlife, fisheries or recreation areas.

Throughout these discussions, only dredged spoil was discussed or considered as a potential exception from the general treatment to be accorded pollutants under § 402. [9]

When the Conference Committee met to reconcile the House and Senate versions of the FWPCA bills, a major difference between the bills related to "the issue of dredging." 1 Legt. Hist. 179. Like the AAPA proposal and the Ellender amendment, but unlike the final Senate version, the House bill kept regulatory authority for dredged material disposal with the Secretary of the Army under the existing dredge and fill permit program. The Conference Committee adopted the House version. As the Committee reported:

> *The Conferees were uniquely aware of the process by which the dredge and fill*

---

8. Despite Sen. Ellender's assurances, many other legislators had concerns about the polluting effects of dredged spoil. While recognizing the economic arguments for open water disposal of dredged spoil, the Conference Committee reported:

> [T]he Committee expects the Administrator and the Secretary to move expeditiously to end the process of dumping dredged spoil in water—to limit to the greatest extent possible the disposal of dredged spoil in the navigable inland waters of the United States including the Great Lakes—to identify land-based sites for the disposal of

dredged spoil and, where land-based disposal is not feasible, to establish diked areas for such disposal.

1 Legt. Hist. 179. Consequently, while dredged spoil was excepted from § 402, Congress never expected its water-based disposal to continue under the CWA.

9. "Dredged spoil" means "material that is excavated or dredged from waters of the United States." 40 C.F.R. § 232.2. No one argues mountaintop removal overburden is dredged spoil.

*permits are presently handled and did not wish to create a burdensome bureaucracy in light of the fact that a system to issue permits already existed.* At the same time, the Committee did not believe there could be any justification for permitting the Secretary of the Army to make determination as to the environmental implications of either the site to be selected or the specific spoil to be disposed of in a site. Thus, the Conferees agreed the Administrator of the [EPA] should have the veto over the selection of the site for dredged spoil disposal and over any specific spoil to be disposed of in any selected site.

*Id.* (emphasis added). The Conference agreement became 33 U.S.C. § 1344(a)—(d).

Throughout Congressional consideration, dredged spoil was the single pollutant of concern. Section 404 was enacted to allow harbor dredging and dredged spoil disposal to continue expeditiously under the then-existing dredge and fill permit program administered by the Corps. Examination of that permit program, adopted by Congress as CWA § 404, shows fill permits were never issued nor authorized for waste disposal.

## 2. Dredge and Fill Permits

The Corps' dredge and fill permit program to which the Congressional Conference Committee deferred in 1972 was found at 33 C.F.R. §§ 209.120 (1972), entitled "Permits for work in navigable waters." [10] Statutory authority for those 1972 dredge and fill permits was provided under Section 10 of the Rivers and Harbors Act of 1899(RHA), 33 U.S.C. § 403. *See id.* Section 10 concerns "Obstruction of navigable waters generally; wharves; piers, etc.; excavations and filling in." [11] Section 10 does not control waste or refuse disposal, permits for which were required and issued under a separate section of the RHA, Section 13, commonly known as the "Refuse Act." 33 U.S.C. § 407 (discussed below).

The Corps' 1972 dredge and fill permit regulations covered all excavation and construction in navigable waters. For example, the location and plans of dams and dikes across navigable waters must be approved. *Id.* at § 209.120(b)(1)(a). In addition, "Plans for wharves, piers, dolphins, booms, weirs, breakwaters, bulkheads, jetties, or other structures, and excavation or fill in navigable waters must be recommended by the Chief of Engineers and approved by the Secretary of the Army." *Id.* at (b)(1)(b). Throughout the dredge

10. Regulations related to the permit program also were codified in the two subsections immediately following: § 209.125 Dams and dikes across waterways and § 209.130 Piers, dredging, etc. in waterways.

11. RHA § 10 remains in effect and reads now, as it did in 1899 and 1972:

The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the

United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and *it shall not be lawful to excavate or fill,* or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor or refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.

33 U.S.C. § 403 (2001)(emphasis added).

and fill permitting section are references to "*work* and *construction* in navigable waters," 33 C.F.R. § 209.120(f), "including such *work* and *construction* performed by the Corps of Engineers in the capacity of a *construction* agency for other branches and services," *id.*, "*work* and *structures* in or over navigable waters," 33 C.F.R. § 209.120(c)(iii), "*improvements* of any navigable river," 33 C.F.R. § 209.120(e), and "*structures* and *improvements*," 33 C.F.R. § 209.120(d)(3)(all emphases added). These are just examples of numerous references throughout the section that support the conclusion the fill operations contemplated were for work, construction, structure building, and improvement, and never for waste disposal.

Prior to the CWA, waste disposal was overseen, also by the Corps, under the Refuse Act in a separate permit program for discharges or deposits into navigable waters, then found at § 209.131 (1972). This program, authorized by § 13 of the RHA, 33 U.S.C. § 407, provided for permits for discharge or deposit of "refuse matter of any kind or description whatever other than that flowing from streets and sewers and passing therefrom in a liquid state into any navigable water of the United States[.]" 33 C.F.R. § 209.131 (quoting 33 U.S.C. § 407).[12]

The Refuse Act permit program for disposal of waste, refuse, and pollutants was explicitly replaced by § 402 NPDES permits. No Refuse Act permits were to issue after enactment of the CWA amendments on October 18, 1972. *See* 33 U.S.C.

§ 1342(a)(5). Instead, EPA-administered NPDES permits were deemed to be permits issued under the Refuse Act. *Id.* at (a)(4). Refuse Act permit applications pending when the CWA became law were converted into NPDES permit applications. *Id.* at (a)(5).

To recapitulate, prior to 1972 the Refuse Act, § 13 of the RHA, governed waste disposal in navigable waters, while other non-waste-related activities involving excavation and construction in navigable waters were controlled by § 10 of the RHA. Section 10 authorized the dredge and fill permit program. The CWA perpetuated that longstanding distinction: Section 402, which replaced the Refuse Act permit program, regulated waste disposal. Section 404 maintained the Corps' dredge and fill permit program for excavation and construction. While Congress recognized dredged spoil was a form of waste and a pollutant, for reasons of economics and administrative efficiency its disposal was excepted from § 402 and continued to be regulated by RHA § 10 dredge and fill permits, for which § 404 was created. With the exception of dredged spoil disposal, dredge and fill activities permitted under § 404 involved maintenance, construction, work, and structures, not disposal of pollutants or waste.

### 3. 1977 CWA Amendments

The remainder of the current § 404 permit program became law by amendment in 1977 during the only major Congressional

---

**12.** Although dealing with refuse disposal, § 13, like the other sections of the RHA, was enacted for the purpose of protecting navigation and anchorage by keeping navigable waterways free of obstructions, and not as a general pollution control statute. *See Guthrie v. Alabama By–Products Co.*, 328 F.Supp. 1140, 1145–47 (N.D.Ala.1971)(providing extensive legislative history of the RHA); *see also United States v. Republic Steel Corp.*, 362

U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960)(holding industrial discharges reduced river channel depth and created an obstruction within the meaning of § 13 of the RHA); *but cf., United States v. Standard Oil Co.*, 384 U.S. 224, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1966)(extending § 13 violations to commercially valuable gasoline accidentally discharged into navigable river).

revisit of the CWA. Nothing added or discussed regarding the 1977 amendments altered the understanding that § 404 fill material and fill discharge activities do not include waste disposal.[13] *See* 1977 U.S.Code Cong. & Admin. News. 4326–488. Instead the amendments clarified that § 404 fills were permitted for useful purposes: activities having the "purpose" of bringing an area of the navigable waters into a "use." 33 U.S.C. § 1334(f).

Legislators sought to except from § 404 regulation what the Senate Report called "gray area" types of activities about which there had been confusion whether permits were required. S. Rep. 95–370, U.S.Code Cong. Admin. News 1977 4401. A section was added to gather those § 404 exceptions, which include, for example, "normal farming, silviculture, and ranching," maintenance of "existing structures such as dikes, dams, and levees," and "temporary roads for moving mining equipment." 33 U.S.C. § 1344(f)(1)(A), (B), & (D).

To distinguish exempt ("gray areas") from non-exempt § 404 activities, Congress added 33 U.S.C. 1344(f)(2):

> Any discharge of dredged or fill material into the navigable waters *incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject,* where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced, shall be required to have a permit under this section.

33 U.S.C. § 1344(f)(2). According to Congress, the definitive characteristic of dredge and fill discharges requiring § 404 permits is that they have a *purpose* for which the discharge is undertaken, to *use* the land created. Consonant with the long

history of the § 404 permit program, discharge "purpose" is tied to a "use" to which the area will be put. The purpose is not to get rid of waste and dispose of pollutants. Section 404 permits authorize discharge of fill material incident to some *use* of the filled area.

Congress clarified in 1977 that the permitted uses for § 404 fill are useful and constructive: for the *purpose* of bringing an *area* into a *use.* Waste disposal, of course, is undertaken to dispose of waste, not to build useful land. Under the statute, section 404 Clean Water Act permits are not available for fill discharges for the sole purpose of waste disposal.

### 4. Longstanding Regulatory Interpretations

 Agencies' regulations reflect an agency's own longstanding interpretation, which should be accorded "particular deference." *North Haven Bd. of Ed. v. Bell,* 456 U.S. 512, 522 n. 12, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982). Where agencies' interpretations are consistent with Congress's express intent, they are entitled to "substantial deference." *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994).

#### a. Corps' regulations

The Corps' regulations governing the dredge and fill program, found at 33 C.F.R. Pt. 323, accord precisely with the statutory, regulatory and legislative history recounted above. The Corps' definition of fill material was offered as a final rule in 1977. 42 Fed.Reg. 37122, 37145 (July 19, 1977); 33 C.F.R. § 323.2(m)(1977). Since 1977 the Corps has defined "fill material" as:

---

**13.** One purpose of the 1977 amendments was "to ease unnecessary regulation and redtape" by adding general permits and exempting certain activities not involving point source dis-

charges, *id.* at 4400; *see also* 33 U.S.C. §§ 1344(e), (f). State-administered permit programs were also created. *Id.* § 1344(g)-(j).

any material used for the primary purpose of replacing an aquatic area with dry land or of changing the bottom elevation of a[ ] waterbody. *The term does not include any pollutant discharged into the water primarily to dispose of waste, as that activity is regulated under section 402 of the Clean Water Act.*

33 C.F.R. § 323.2(e)(2001)(emphasis added). Under the Corps' definition, "discharge of fill material" means:

the addition of fill material into waters of the United States. The term generally includes, without limitation, the following activities: Placement of fill that is necessary for the *construction* of any *structure* in a water of the United States; the *building* of any *structure* or *impoundment* requiring rock, sand, dirt, or other material for its *construction; site-development* fills for recreational, industrial, commercial, residential, and other *uses;* causeways or road fills; dams and dikes; artificial islands; property *protection* and/or *reclamation* devices such as riprap, groins, seawalls, breakwaters, and revetments; beach nourishment; levees; *fill for structures* such as sewage treatment facilities, intake and outfall pipes associated with power plants and subaqueous utility lines; and artificial reefs.

33 C.F.R. § 323.2(f)(emphasis added). Exactly as designated by Congress, *see* 33 U.S.C. 1344(f)(2), § 404 fill is material discharged into water for construction, devel-opment, or property protection, activities defined by their ultimate use and purpose. Similarly reflecting the basic structure of the CWA permit programs, waste disposal (except dredged spoil) is regulated under § 402.

Since 1977 the Corps' definitions of "fill material" and "discharge of fill material" have correctly stated the law.

### b. EPA regulations

The Corps administers the § 404 dredge and fill permit program, with environmental oversight of § 404 disposal sites from the EPA.[14] Longstanding EPA definitions of "fill material" and "discharge," while not identical to Corps' definitions, when considered together, point to the same use and purpose requirement. The EPA defines "fill material" as "any 'pollutant' which replaces portions of the 'waters of the United States' with dry land or which changes the bottom elevation of a water body *for any purpose.*" 40 C.F.R. § 232.2 (emphasis added).

Through this simple language, the EPA definition introduces a crucial ambiguity. Compare the statute:

Any discharge of dredged or fill material into the navigable waters *incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject,* where the flow or circulation of navigable waters may be impaired or the reach of such waters be

---

**14.** Defendants argue because EPA has ultimate administrative authority to construe the CWA and in particular § 404, EPA's definition of "fill material" governs. For the proposition of EPA authority, they rely on an Opinion of the Attorney General finding such authority to construe the jurisdictional term "navigable waters" and § 404(f) of the Act. *See* 43 U.S. Op. Atty. Gen. 197, 1979 WL 16529 (1979). The Attorney General relied on legislative history, as discussed above, showing "hot[ ] debate[ ]" whether the Secre-tary of the Army should play any role in issuing permits and the ultimate resolution, in which the EPA Administrator retained substantial responsibility over administration and enforcement of § 404. *See id.* at 199.

Without deciding whether EPA administrative authority extends from jurisdictional issues through every aspect of regulation under § 404, the Court is willing to accept Defendants' premise *arguendo.* Nonetheless, any EPA definition also must accord with the CWA and Congressional intent.

reduced, shall be required to have a permit under [§ 404].

33 U.S.C. § 1344(f)(2). Under the statute, filling is for a purposeful activity, to carry out some use that requires the waters be filled. Under the EPA definition, the purpose could be construed solely as that of the discharge. So, for example, under the statute, one could not discharge a pollutant for the sole purpose of waste disposal; ironically, under the EPA definition, waste disposal could be potentially permissible.

Despite this ambiguity, which the EPA definition introduces into an otherwise clear regulatory scheme, EPA's similarly longstanding definition of "discharge of fill material" makes clear the agency never before now proposed that waste disposal would be a proper § 404 purpose for filling waters of the United States. Historically, EPA has defined "discharge of fill material" as:

> the addition of fill material into waters of the United States. The term generally includes, without limitation, the following activities: Placement of fill that is *necessary for the construction of any structure* in a water of the United States; the *building of any structure or impoundment* requiring rock, sand, dirt, or other material for its *construction; site-development* fills for recreational, industrial, commercial, residential, and other *uses;* causeways or road fills; dams and dikes; artificial islands; property *protection* and/or *reclamation* devices such as riprap, groins, seawalls, breakwaters, and revetments; beach nourishment; levees; fill for *structures* such as sewage treatment facilities, intake and outfall pipes associated with power plants and subaqueous utility lines; and artificial reefs.

40 C.F.R. § 232.2 (emphasis added).[15] As the EPA has said always, until May 3, 2002, the purpose for discharging § 404 fill is the construction or development or use for which the fill is needed, not the purpose for which the material is discharged. Nowhere is waste disposal cited as a proper purpose.

Agency regulations, in place virtually since the CWA's inception, authorize § 404 permits only for fill discharges for uses and purposes served by the filled area. As the Corps' regulations have made clear, waste disposal is not permitted under § 404. These portions of the regulations remain consistent with Congressional intent. The EPA definition introduces an ambiguity present nowhere else in the statutory or regulatory scheme when it allows that fill discharges might be "for any purpose." But the EPA's longstanding specified purposes for discharge of fill material all have the primary purpose of placing the fill for some use. The filling authorized is not the incidental result of waste disposal. The agencies' longstanding regulations, with the exception of EPA's potential permitting of § 404 discharges "for any purpose," are consistent with Congressional intent, and are otherwise due substantial deference, which the Court accords to them.

### 5. 1986 Memorandum of Agreement on Solid Waste and RCRA

The differing "fill material" definitions from EPA and the Corps earlier raised a similar question to that before the Court today. The Resource Conservation and Recovery Act Amendments of 1984 (RCRA), 42 U.S.C. §§ 6901, *et seq.,* required steps be taken to improve the control of solid waste.[16] Concerned whether

---

**15.** The EPA definition of "discharge of fill material" is identical to the Corps' longstanding definition of the same term.

**16.** RCRA explicitly excepts coal mine overburden where hazardous wastes are involved. *See* 42 U.S.C. § 6905(c). The Secretary of the Interior has exclusive responsibility in that

§ 402 or § 404 should regulate such discharges of solid waste materials into waters of the United States for the purpose of disposal of waste, the two agencies entered into an interim agreement,[17] Memorandum of Agreement on Solid Waste. 51 Fed.Reg. 8871 (Mar. 14, 1986)(1986 MOA). The main focus of the arrangement was to ensure an effective enforcement program under the CWA. *See* 33 U.S.C. § 1319.

Under the MOA, the agencies agreed a "discharge will normally be considered to meet the [Corps'] definition of 'fill material'" by consideration of the following factors:

a. The discharge has as its primary purpose or has as one principle purpose of multi-purposes to replace a portion of the waters of the United States with dry land or to raise the bottom elevation.

b. The discharge results from activities such as road construction or other activities where the material to be discharged is generally identified with construction-type activities.

c. A principal effect of the discharge is physical loss or physical modification of waters of the United States, including smothering of aquatic life or habitat.

d. The discharge is heterogeneous in nature and of the type normally associated with sanitary landfill discharges.[18]

1986 MOA at B.4. (The list does not indicate whether it is disjunctive or conjunctive.)

Of particular note, the first factor maintains in slightly attenuated, but not unrecognizable form, the primary purpose test. Section 404 fill material is discharged to create dry land or raise the bottom eleva-

tion. Implicit is that some useful purpose is required to justify the filling. Understandably, under the CWA, with its purpose to maintain the integrity of the nation's waters, filling of rivers and streams cannot be undertaken simply to turn them into dry land, that is, simply to destroy them. As "fill" has been understood, at least since inception of the Corps' dredge and fill permit program, filling to create dry land or elevate a bottom must be undertaken for some constructive or useful purpose.

To the extent the MOA supports a primary purpose test for fill material, the agreement is consonant with the statute and the legislative and regulatory history. Additionally, the effect of "physical loss or physical modification" of waters in the third factor comports with Congress' concern that § 404 permits issue "where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced." 33 U.S.C. § 1344(f)(2). As agency interpretation, consistent with Congressional intent, the agreement is due substantial deference.

Under the 1986 MOA, however, § 404 permits are not available for disposal of surface coal mine overburden solely for the purpose of waste disposal. Our Court of Appeals made the same observation concerning the 1986 MOA. The issue concerned EPA oversight of permits for in-stream treatment ponds and fills for disposal of waste associated with surface coal mining operations. *West Virginia Coal Assoc. v. Reilly*, 932 F.2d 964, 1991 WL 75217 (4th Cir.1991)(unpublished decision aff'g 728 F.Supp. 1276)(S.D.W.Va.1989).

area under the Surface Mining Control and Reclamation Act, 30 U.S.C. § 1201 *et seq. Id.*

17. Although characterized as "interim," the MOA has not been superseded or renounced in the decade and a half since.

18. By definition, a "sanitary landfill" is a facility for solid waste disposal which meets criteria published under section 6944. 42 U.S.C. § 6903(26). At a minimum, a sanitary landfill has "no reasonable probability of adverse effects on health or the environment from disposal of solid waste." *Id.* at § 6944.

Having examined the 1986 MOA, the Circuit Court observed,

> It is apparent from the MOA that the types of fills and discharges at issue in this case fall under [§ 402]. The discharge of fill material at issue here is expressly for the purpose of disposing of waste or spoil from mining operations.

*Id.* 1989 WL at *4.

When overburden is dumped into valleys and streams to get rid of it, the disposal has the effect of creating dry land, but not the purpose. Because land creation or elevation is not a principle purpose of overburden disposal in streams, such a discharge would not meet the Corps' definition of "fill material" as agreed in the MOA, nor be permittable under § 404.

Again, longstanding regulatory interpretation of both the Corps and EPA supports the conclusion that § 404 fill permits shall issue only for fills with a constructive primary purpose, not waste disposal.

### 6. CWA Consistency with the Surface Mining Control and Reclamation Act

The Surface Mining Control and Reclamation Act of 1977 (SMCRA), Pub.L. 95–87 (1977)(codified at 30 U.S.C. §§ 1201–1238) provides general standards for surface coal mining operations. Under SMCRA, a savings clause provides nothing therein "shall be construed as superseding, amending, modifying, or repealing the ... Clean Water Act, the State laws enacted pursuant thereto, or other Federal laws relating to preservation of water quality." 30 U.S.C. § 1292(a)(3). Accordingly, if SMCRA regulation condoned overburden waste disposal in streams that would be

inconsistent with the CWA and it would be trumped by the CWA. SMCRA, however, does not condone overburden waste disposal in streams. SMCRA is consistent with the CWA. Two central features of the SMCRA scheme support CWA protections for overburden disposal: approximate original contour (AOC) provisions and the buffer zone rule.

■ Under SMCRA, surface coal mine operators are required "as a minimum" to "restore the approximate original contour of the land." 30 U.S.C. § 1265(b)(3). Where the volume of overburden is large relative to the amount of coal removed, and where that volume is increased due to the "swell factor" associated with earth removal, not all the earth and rock removed during mining is needed to restore AOC. *See Bragg v. Robertson,* 72 F.Supp.2d 642, 646 (S.D.W.Va.1999), *affirmed in part, vacated in part on other grounds,* 248 F.3d 275 (4th Cir.2001).[19] The unneeded overburden or "excess spoil" is the waste material disposed of and deposited in valley fills, ostensibly authorized by § 404 permits, and the subject of this Memorandum Opinion.

Waivers to AOC requirements are available when land will be put to "an equal or better economic or public use." 30 U.S.C. § 1265(e)(3)(A). AOC waivers may be allowed for "industrial, commercial, agricultural, residential, or public facilit[ies] (including recreational facilities)." 30 C.F.R. § 824.11. SMCRA's statutory and regulatory scheme thus assumes overburden will be returned to the mountaintop removal site recreating AOC unless a constructive primary purpose is designated for the site.

---

**19.** The district court opinion was overruled on Eleventh Amendment jurisdictional grounds because the remaining Defendant Director of the West Virginia Division of Environmental Protection, a state official, was determined to be enforcing state, not federal

law. *Bragg,* 248 F.3d at 296. In *Bragg,* our Court of Appeals did not reach nor address any of this Court's substantive discussion of SMCRA, AOC, the state and federal buffer zone rules, or their interrelations with the CWA.

Only where the site will be improved for "an equal or better economic or public use," does the statute contemplate overburden or excess spoil placement elsewhere.

This Court previously noted the consonance between these SMCRA presumptions and provisions of the CWA as regulated by the Corps since 1977. *Bragg,* 72 F.Supp.2d at 656. Section 404 fill material, under the Corps' longstanding definition, is placed for a constructive "primary purpose." 33 C.F.R. § 232.2(e). "Discharge of fill material" includes numerous approved uses including "site-development fills for recreational, industrial, commercial, residential, and other uses." 33 C.F.R. § 323.2(f).

In SMCRA, when Congress dealt specifically with surface coal mining overburden, it reinforced its plan that fills were appropriate where, and only where, they were justified by some constructive end use and purpose served by the fill itself. Otherwise, such overburden is just waste, to be returned to the mine site to recreate the AOC of the landscape mined. SMCRA contains no provision authorizing disposal of overburden waste in streams, a conclusion further supported by the buffer zone rule.

In 1977 the Office of Surface Mining (OSM) promulgated the so-called "buffer zone rule," which provides:

No land within 100 feet of a perennial stream or an intermittent stream[20] shall be disturbed by surface mining activities, unless the regulatory authority specifically authorizes surface mining activities closer to, or through such a stream. The regulatory authority may authorize such activities only upon finding that -

(1) Surface mining activities will not cause or contribute to the violation of applicable State or Federal water quality standards, and *will not adversely affect the water quantity and quality or other environmental resources of the stream.*

30 C.F.R. § 816.57 (emphasis added). Under SMCRA, the buffer zone rule protects perennial and intermittent streams and their parts and reaches from surface mining incursions that affect their water quality and quantity or other environmental resources, consonant with the Clean Water Act. *See Bragg,* 72 F.Supp.2d at 649–52. For fill placement, these values are supposed to be protected by § 404 permits, which may not authorize destruction of perennial or intermittent streams solely for waste disposal.[21] SMCRA further supports this plan by requiring overburden waste to be returned to the mine site unless a higher and better constructive purpose is served by the fill.

Having considered the legislative history and statutory scheme of the CWA, its

---

**20.** "Intermittent stream" means "(a) a stream or reach of a stream that drains a watershed of at least one square mile, or (b) a stream or reach of a stream that is below the local water table for at least some part of the year, and obtains its flow from both surface runoff and ground water discharge."

"Perennial stream" means "a stream or part of a stream that flows continuously during all of the calendar year as a result of ground-water discharge or surface runoff." 30 C.F.R. § 701.5.

**21.** Ephemeral streams, not protected by the buffer zone rule, flow "only in direct response

to precipitation in the immediate watershed or in response to the melting of a cover of snow and ice, and which has a channel bottom that is always above the local water table." 30 C.F.R. § 701.5. Because the buffer zone rule does not extend to these drainways above intermittent and perennial streams, it suggests the regulatory scheme was intended specifically to protect waterways without absolutely forbidding overburden disposal on land, even though water might at times run over it.

longstanding regulatory and administrative interpretation and its consistency with RCRA and SMCRA, the Court is led inexorably to the conclusion § 404 of the CWA authorizes permits for fill material only for a constructive primary purpose, not solely for waste disposal. Authorization of § 404 permits for waste disposal generally, and specifically for coal mining overburden at mountaintop removal mines, is *ultra vires,* exceeding the statutorily granted authority of EPA or the Corps. Only Congress can rewrite the Clean Water Act to allow otherwise.

### D. Defendants' Arguments in Support of § 404 Permits for Valley Fill Waste Disposal

Defendants counter that EPA's longstanding definition allows § 404 permits "for any purpose," and so authorizes coal overburden waste disposal practices. Using the EPA definition, the Corps has approved valley fills for overburden disposal for years. The Court should defer to the agency's longstanding regulatory practice.

■■■ Further, if the current EPA definition is not clear enough, rulemaking will shortly eliminate any potential confusion by replacing the Corps' primary purpose definition with a "final effect" version, which will expressly allow § 404 permitting of mountaintop removal waste disposal in valley fills constructed solely to dispose of waste. Defendants argue the new rule moots any objections.[22]

### 1. Longstanding Regulatory Practice

■■■ The Corps and Intervenors argue § 404 permits have been issued for valley fills designed for waste disposal for decades under the EPA definition of fill. The same rationale is offered in the proposals for a final rule, where the agencies lean heavily on past practice. One benefit of the rule change, according to the agencies, is the final rule "is generally consistent with current agency practice." (Corps Status Report (May 6, 2002), Ex. 1, 19 (Final Rule).)

Until May 3, 2002 the Corps' definition, in complete accord with the CWA, explicitly excluded waste disposal as a purpose for § 404 fills. All § 404 fills approved by the Corps solely for waste disposal were illegal.[23]

Until May 3, 2002 EPA defined "fill material" as "any 'pollutant' which re-

---

**22.** Defendants also assert the Court upheld their version of § 404 when it approved a Settlement Agreement between the Corps and West Virginia citizens in *Bragg,* the jurisdiction of which was upheld on appeal. *See Bragg v. Robertson,* 54 F.Supp.2d 653 (S.D.W.Va.1999). According to Defendants, the Settlement Agreement presumed coal mining overburden would continue to be permitted under § 404, and this determination by the Court has precedential effect.

Under the Settlement Agreement, which the Court reviewed and found to be fair and reasonable, Plaintiff reserved the "right to challenge under the APA any future Corps' CWA section 404 authorization for any valley fill in waters of the United States that may be authorized by the Corps" after the Settlement. (Pl.'s Mot. for Prelim. Inj., Ex. 19 ¶ 16.) The Settlement Agreement left the issue of the agencies' authority to issue § 404 permits for valley fills open and undetermined. Under any legal analysis of the Settlement Agreement's preclusive effects, therefore, this issue was explicitly left undecided and its merits undetermined.

**23.** How the Corps came to issue § 404 permits for mountaintop removal waste disposal in flagrant disregard of the statute and its own regulations is a historical question that the Court does not have information or expertise to determine. Knowing that mountaintop removal mines have expanded exponentially over the past two decades, one might speculate, as the Corps' Rodney Wood testified, the Corps didn't necessarily intend to regulate valley fills, but "they just sort of oozed into that." (Pl.'s Mot. for Prelim. Inj., Ex. 17, p. 23.)

places portions of the 'waters of the United States' with dry land or which changes the bottom elevation of a water body *for any purpose.*" 40 C.F.R. § 232.2 (emphasis added). As discussed above, this definition introduced a potential ambiguity into the statutory and regulatory scheme. Under the statute, § 404 permits are required where the fill has the *purpose* of bringing an *area* into a new *use. See* 33 U.S.C. § 1344(f)(2). The EPA definition, however, might be understood to apply to the use or purpose, not of the fill, but of the discharge. Under that reading, however, the regulation would be inconsistent with the statute. It would also conflict with the EPA's own definition of "discharge of fill material," which involved constructive, purposeful and useful fills, not fills constructed solely for waste disposal. Accordingly, the reading of the ambiguous EPA definition of fill material that would allow *discharges* "for any purpose" is necessarily incorrect. Section 404 fills permitted solely for waste disposal were not legal then and are not now.

An illegal agency practice has no precedential value and is due no deference. The fact the Corps approved § 404 permits solely for massive waste disposal in the past two decades, with EPA's approval, is an admission against interest, not a mitigating factor, much less an argument the Court should approve the practice. Tacitly recognizing the futility of this argument, the agencies attempted to fix the problem by changing the law, without benefit of Congressional amendment.

### 2. Rulemaking: The "Final Effect"

█ On April 20, 2000 the Corp and EPA jointly proposed to revise their definitions of "fill material." *See* 65 Fed.Reg. 21292 (Apr. 20, 2000). According to news reports, more than 17,000 comments, most of them negative, delayed the rule's adoption.[24] On May 3rd, 2002 while the Court was considering these matters, the agencies signed for publication the final version of their rule.

Both agencies' proposed final rule defines "fill material" as "material placed in waters of the United States where the material has *the effect of*" either "replacing any portion of a water of the United States with dry land or changing the bottom elevation of any portion of a water." Final Rule at 59 (emphasis added). Consequently, the narrow use and purpose exception authorizing fill activities under Corps' dredge and fill permits is eliminated by administrative fiat with the stroke of a pen. Without the necessity of legislation, and by design, surface coal interests are assured:

> With regard to proposed discharges of coal mining overburden, we believe that the placement of such material into waters of the U.S. has the *effect of fill* and therefore, should be regulated under CWA section 404.

65 Fed.Reg. at 21295 (emphasis added).

The new rule now incorporates expansive examples:

> Examples of such fill material include, but are not limited to: rock, sand, soil, clay, plastics, construction debris, wood chips, *overburden from mining or other excavation activities,* and materials used to create any structure or infrastructure in the waters of the United States.

Final Rule at 59. The rule also excludes certain other materials: "The term fill does not include trash or garbage." *Id.*

The agencies' new definitions of "discharge of fill material" continue to consist

---

24. Summarizing the comments, the agencies acknowledge, "We received over 17,200 comments on the proposed rule[.] Most of the comments were form letters *which opposed the rule."* Final Rule at 11 (emphasis added).

of their lists of constructive uses and purposes. Sensibly, "infrastructure" will be added wherever "structure" appears. Almost at the end of the definition, after "utility lines," the agencies will add this language:

> placement of fill material for construction or maintenance of any liner, berm or other infrastructure associated with solid waste landfills;[25] *placement of overburden, slurry, or tailings or similar mining-related materials* [.]

Final Rule at 58–9 (emphasis added). Interestingly, the only exception to the long list of uses and purposes for fill discharges is the new addition of mining-related waste disposal.

These new agency definitions set forth in the final rule are fundamentally inconsistent with the CWA, its history, predecessor statutes, longstanding regulations, and companion statutes. Under the guise of regulatory harmony and consistency, the agencies have taken an ambiguous interpretation, that of the EPA, seized the unsupportable horn of the ambiguity, and now propose to make their original error and administrative practice the law. Section 404 fill permits have always been allowed for beneficial uses and purposes of the fill. It is the constructive use and purpose that justify filling the waters of the United States.

The agencies now, however, propose in their final rule to ignore fill use and purpose entirely. Only "fill effect" will be considered. As a child could explain, the effect of filling things is that they get full. By expunging the use and purpose doctrine for fills and replacing it with an effect test, the agencies expand the Corps' CWA authority. The definition is a tautology; all fills have the effect of filling. Through this empty definition, the agencies allow the waters of the United States to be filled, polluted, and unavoidably destroyed, for any purpose, including waste disposal. Pointedly, the rule is intended to and does allow the massive filling of Appalachian streams with mine waste under auspices of the CWA. The justification under the new definition is no longer to foster a beneficial use and purpose. A fill is now justified merely because it has the effect of creating a convenient repository of waste.

The agencies' explanations that regulatory harmony and consistency will result and regulatory practice be maintained are disingenuous and incomplete. The Court does not rule in a vacuum. It is aware of the immense political and economic pressures on the agencies to continue to approve mountaintop removal coal mining valley fills for waste disposal, and to give assurances that future legal challenges to the practice will fail. Some may believe that reasonably priced energy from coal requires cheap disposal of the vast amounts of waste material created when mountaintops are removed to get at the natural resource. For them, valley fill disposal is the most efficient and economical solution.

Congress did not, however, authorize cheap waste disposal when it passed the Clean Water Act. The purpose of the Act was, and is, to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The statutory scheme is already consistent and harmonized. The agencies' new final rules are inconsistent with the statutory scheme. Thus, the purported rulemaking is *ultra vires:* it exceeds the agencies' statutory authority granted by the CWA. Only Congress can

---

**25.** This language addresses another litigation-related § 404 problem involving the definition of fill material. *See Resource Investments Inc. v. United States Army Corps of Engineers,* 151 F.3d 1162 (9th Cir.1998).

rewrite the CWA to allow the fundamental changes proposed by the agencies to the § 404 dredge and fill permit program.

## III. CONCLUSION

When the Clean Water Act was passed in 1972 and amended in 1977, the Army Corps' dredge and fill permit program was maintained for political and economic reasons relating largely to port maintenance. The program became § 404. Generally, permits for pollutant discharge issued under § 402, the National Pollutant Discharge and Elimination System (NPDES). After heated debate, Congress excepted dredged spoil and allowed the dredge and fill permit program, begun under § 10 of the Rivers and Harbor Act, to continue under Corps' supervision, with environmental oversight from EPA. Under the § 10 program, as grandfathered in, fills were allowable to underpin structures, support roads, protect and improve development, that is, for purposes or uses for which the fill was needed. Congress never intended § 10 fills, nor § 404 fills, to be permitted solely to dispose of waste.

To read the Act otherwise presumes Congress intended the Clean Water Act to protect the nation's waterways and the integrity of its waters with one major exception: the Army Corps was to be given authority to allow the waters of the United States to be filled with pollutants and thus destroyed, even if the sole purpose were disposal of waste. This obviously absurd exception would turn the "Clean Water" Act on its head and use it to authorize polluting and destroying the nation's waters for no reason but cheap waste disposal.

Nevertheless, for the past twenty years, particularly in the Huntington Corps District, § 404 permits have been issued for mountaintop removal overburden disposal in valley fills that have obliterated and destroyed almost a thousand miles of streams, by the Corps' own account. The valley fills are used solely to dispose of the waste rock and dirt that overlies the coal. Past § 404 permit approvals were issued in express disregard of the Corps' own regulations and the CWA. As such, they were illegal. When the illegitimate practices were revealed by court decisions in this district, the agencies undertook to change not their behavior, but the rules that did not support their permit process.

The agencies' final rules attempt to legalize filling the waters of the United States under the CWA solely for waste disposal. The obvious perversity of this proposal forced the agencies to suggest baseless distinctions among wastes: "trash" and "garbage" are out; plastic, construction debris and wood chips are in. The final rule for "discharge of fill material" highlights that the rule change was designed simply for the benefit of the mining industry and its employees. Only one type of waste is added to the otherwise constructive list: "overburden, slurry, or tailings or similar mining-related" waste are now permissible fill in the nation's waters.

The agencies' attempt to legalize their longstanding illegal regulatory practice must fail. The practice is contrary to law, not because the agencies said so, although their longstanding regulations correctly forbade it. The regulators' practice is illegal because it is contrary to the spirit and the letter of the Clean Water Act.

Accordingly, the Court **FINDS** and **CONCLUDES** § 404 fills may not be permitted solely to dispose of waste. Plaintiff's motion is **GRANTED**. The motions of the Corps Defendants and Defendant–Intervenors are **DENIED**. The Corps Defendants are **ENJOINED** from issuing any further § 404 permits that have no primary purpose or use but the disposal of waste. In particular, issuance of moun-

taintop removal overburden valley fill permits solely for waste disposal under § 404 is **ENJOINED**.

The agencies' new final rules address political, economic and environmental concerns to effect fundamental changes in the Clean Water Act for the benefit of one industry. However important to the energy requirements of the economy and to employment in the region, amendments to the Act should be considered and accomplished in the sunlight of open Congressional debate and resolution, not within the murk of administrative after-the-fact ratification of questionable regulatory practices.